# EXHIBIT E

DAVID CHIU (SBN 189542)
City Attorney
YVONNE R. MERE (SBN 173594)
Chief Deputy City Attorney
SARA J. EISENBERG (269303)
Chief of Complex & Affirmative Litigation
RONALD LEE (SBN 238720)
Asst. Chief of Complex & Affirmative Litigation
JESSE E. LANIER (SBN 303395)
Deputy City Attorney
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California 94102
Tel.:  415-554-3944
Email: Jesse.Lanier@sfcityatty.com

*Attorneys for Plaintiff the People of the State of California, acting by and through San Francisco City Attorney David Chiu*

[Additional counsel appear on signature page.]

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, Acting by and through San Francisco City Attorney DAVID CHIU<br><br>Plaintiff,<br><br>vs.<br><br>THE KRAFT HEINZ COMPANY.; MONDELEZ INTERNATIONAL, INC.; POST HOLDINGS, INC.; THE COCA-COLA COMPANY; PEPSICO, INC.; GENERAL MILLS, INC.; NESTLE USA, INC.; KELLANOVA; WK KELLOGG CO.; MARS INCORPORATED.; CONAGRA BRANDS, INC.; and DOES 1-50,<br><br>Defendants. | CASE NO:<br><br>**COMPLAINT FOR:**<br><br>VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW AND PUBLIC NUISANCE |

-1-

COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

PARTIES ......................................................................................................................... 4

JURISDICTION AND VENUE ...................................................................................... 7

STATEMENT OF FACTS .............................................................................................. 8

 I. What Are Ultra-Processed Foods? ................................................................. 8

 II. UPF Are Dangerous: "No reason exists to believe that humans can fully adapt to these products." ............................................................................................................... 12

 III. UPF—Like Tobacco and Illegal Drugs—Are Addictive. .............................. 17

  A. UPF Cause Compulsive Use in the Same Ways as Other Addictive Substances. ......... 17

  B. UPF Are Psychoactive Substances. ............................................................... 20

  C. UPF Are Reinforcing. ..................................................................................... 21

 IV. Defendants Designed UPF To Be Addictive to Drive Sales and Profits. ...... 22

  A. "[I]n the Flavor Business": Big Tobacco Becomes Big Food. ..................... 22

  B. "All of the Pleasure Drugs That Are Not Regulated": Big Food Deploys Addiction Science to Hack the Human Brain. ............................................................... 24

 V. Defendants Have Created a Public Health Crisis, Especially for Children. ...... 29

 VI. Defendants Have Deliberately Targeted Kids ................................................ 31

  A. Defendants Use Harmful Dyes to Make UPF More Appealing to Children. ............... 32

  B. Defendants Have Aggressively Marketed Their UPF to Children and Successfully Changed Children's Diets. ........................................................................... 33

  C. Big Food Targets Kids to Cultivate Lifelong UPF Customers. ..................... 35

  D. Defendants Disproportionately Target Black and Latine/x Communities. .................... 37

  E. Defendants' Marketing Techniques for Children Closely Follow the Big Tobacco Playbook. .......................................................................................................... 38

 VII. "Deny, Denounce, Delay:" Defendants Actively Conceal the Dangers of UPF. ............ 50

 VIII. UPF Have Contributed to a Public Health Crisis in San Francisco. .............. 54

FIRST CAUSE OF ACTION ....................................................................................... 56

SECOND CAUSE OF ACTION ................................................................................... 59

REQUEST FOR RELIEF ............................................................................................. 60

COMPLAINT

## COMPLAINT

Plaintiff the People of the State of California, (the "People"), acting by and through San Francisco City Attorney David Chiu, against Defendants The Kraft Heinz Company, ("Kraft Heinz"); Mondelez International, Inc. ("Mondelez"); Post Holdings, Inc. ("Post Holdings"); The Coca-Cola Company ("Coca-Cola"); PepsiCo, Inc. ("PepsiCo"); General Mills, Inc. ("General Mills"), Nestle USA, Inc. ("Nestle"); Kellanova; WK Kellogg Co.; Mars Incorporated ("Mars"); ConAgra Brands, Inc. ("ConAgra"), and Does 1-50 (collectively, "Defendants"), who allege as follows.

## INTRODUCTION

1.    In 1999, in Minneapolis, an executive climbed the dais in front of his fellow executives and begged them to change.

2.    "There are no easy answers," he said. "But this much is clear:  For those of us who've looked hard at this issue, whether they're public health officials or staff specialists in your own companies, we feel sure that the one thing we shouldn't do is nothing."[1]

3.    The executive wasn't the head of a health insurance company, drug company, car manufacturer, or firearms company. His name was Michael Mudd, and he was the Vice President to the predecessor of Kraft Heinz, a conglomerate best known for making food products such as bright red ketchup and electric yellow macaroni and cheese.  He was speaking to his peers that day in 1999 about the devastating consequences of developing and marketing ultra-processed foods ("UPF") to Americans—and to children in particular.

4.    After months interrogating scientific data with a colleague, Mudd spoke about the "devastating public health consequences" of UPF consumption. He noted that the UPF industry had caused childhood obesity rates to double, that health conditions caused by consumption of ultra-processed foods were costing up to $100 billion a year, and, incredibly, ***causing 300,000 Americans to die each year***.[2]

[1] Michael Moss, *Salt Sugar Fat: How the Food Giants Hooked Us* (2013); Michael Mudd, Remarks for ILSI CEO Dinner, (Draft April 2, 1999).
[2] *Id.*

-1-

COMPLAINT

5.    Yet, despite his pleas—and despite the devastating statistics he shared—his colleagues, many of them executives of the defendant companies, were entirely unmoved. If anything, they were emboldened. They knew that their companies were designing, selling, and distributing harmful foods—and relentlessly marketing those foods to children. They knew that doing so was wreaking havoc at every step, and they didn't care.

6.    "[W]e cannot pretend food isn't part of the obesity problem," Mudd said, but that's exactly what the vast majority of the other food executives did.[3]

7.    Mudd was right. Big Food was, and still is, using the deceitful tactics it inherited from the Big Tobacco industry to flood the market with harmful UPF products and to aggressively sell those products to children.  Collectively, Phillip Morris and R.J. Reynolds dominated the U.S. food system for decades.[4]  During this time, they used psychological and marketing techniques—originally developed for marketing and selling cigarettes—to engineer, manufacture, and sell UPF, with a specific eye to selling UPF to children, whom they viewed as their future profit base.  Big Food did all this with the singular goal of making UPF a staple of the American diet, regardless of the health and societal damage that they knew UPF would cause.

8.    These companies were extraordinarily successful.  UPF make up more than 70% of grocery store products and more than half of the diets for individuals in the U.S.[5]  UPF sit on the pantry shelves of nearly every household in America, and American children get two-thirds of their daily energy from UPF.[6]

9.    But the explosion and dramatic increase in availability of UPF has coincided with a dramatic increase in the incidence of obesity, diabetes, heart disease, cancers, and other life-

---

[3] *Id.*

[4] Carlos A. Monteiro et al., *Ultra-Processed Foods*, *Diet Quality and Human Health Using the NOVA Classification System* (Food and Agric. Org. of the U.N. 2019); Carlos A. Monteriro, et al., *Ultra-Processed Foods: What They Are and How to Identify Them*, 22 Pub. Health Nutr. 936 (2019); Jean-Claude Moubarac et al., *Ultra-Processed Food and Drink Products in Latin America: Trends*, *Impact on Obesity*, *Policy Implications* (Pan Am. Health Org. 2015), at 6-8.

[5] Jessica Taylor Price, *Has Your Food Been Chemically Altered? New Database of 50,000 Products Provides Answers, Northeastern Glob. News* (May 25, 2022).

[6] Lu Wang et al., Trends in Consumption of Ultraprocessed Foods Among US Youths Aged 2-19 Years, 1999-2018, 326 JAMA 519 (2021).

-2-

COMPLAINT

changing chronic illnesses.[7] There is a growing and increasingly irrefutable body of evidence tying the rise of UPF to these adverse health effects. There is also a growing and increasingly irrefutable body of evidence illustrating the addictive nature of UPF. As alleged in greater detail below, addictiveness is a feature of UPF, not a bug.  UPF manufacturers are tricking us into eating ourselves to death.

10.    This case is not about food that is merely "unhealthy."  This case is about food products with hidden health harms, that Defendants designed to be cheap, colorful, flavorful, and addictive. This case is about food products whose ingredients and manufacturing processes interrupt our bodies' abilities to function.  It is about the Defendants—gigantic food conglomerates, all—who designed, manufactured, marketed, and sold these foods knowing they were dangerous for human consumption.

11.    Defendants did everything in their power to deprive consumers of an informed choice.  They designed food to be addictive, they knew the addictive food they were engineering was making their customers sick, and they hid the truth from the public.  They relentlessly promoted these dangerous products, made untold billions of dollars from doing so, and then they left taxpayers to foot the bill for the resulting public health crisis.

12.    The nationwide epidemic of these preventable diseases, especially among children, has a clear origin—Defendants' conduct. And this conduct has significantly contributed to a serious public health problem in San Francisco.

13.    "Quite simply, change will have to be forced—by public pressure, media attention, and litigation," said Mudd, after he resigned. Once again, Mudd was right. Defendants have not acted to address this crisis, so Plaintiff, as a statutorily assigned steward of public health, is forcing their hand.[8]

14.    Plaintiff, therefore, brings this action pursuant to California state law for declaratory and injunctive relief, statutory civil penalties, and abatement relief due to Defendants' wrongful conduct, asserting the following causes of action: (1) violation of the Unfair Competition Law

---

[7] Regina M. Benjamin, *The Surgeon General's Vision for a Healthy and Fit Nation*, 125 Public Health Rep. 514 (Jul. 2010).

[8] *Id.*

COMPLAINT

("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*; and (2) public nuisance pursuant to Civ. Code § 3479 (on behalf of the City and County of San Francisco).

**PARTIES**

15.     Plaintiff the People of the State of California, acting by and through San Francisco City Attorney David Chiu, brings this suit pursuant to Business and Professions Code sections 17204 and 17206 to address violations of the California Unfair Competition Law ("UCL"); Code of Civil Procedure section 731; and Civil Code sections 3479, 3480, 3491, and 3494 to abate the public nuisance caused by Defendants within San Francisco.

16.     Defendant Kraft Heinz is a Delaware corporation with its principal place of business and headquarters located at One PPG Place, Pittsburgh, Pennsylvania 15222.

17.     Kraft Heinz is a successor to Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., Kraft Foods, Inc. and H.J. Heinz Company.

18.     Kraft Heinz UPF brands include Kraft, Heinz, Oscar Mayer, Ore-Ida, Velveeta, Smart Ones, Capri Sun, Kool-Aid, Weight Watchers, Jell-O, Philadelphia Cream Cheese, Lunchables, Bagel Bites, Classico, Cool Whip, Country Time, Crystal Light, Jet-Puffed, Miracle Whip, Shake 'N Bake, Stove Top, Sure-Jell, Smart Ones, Boca Burger, Cheez Whiz, and A.1.

19.     Defendant Mondelez is a Virginia corporation with its principal place of business and headquarters located at 905 West Fulton Market, Suite 200, Chicago, Illinois 60607.

20.     Mondelez is a successor to R.J. Reynolds Industries Inc., RJR Nabisco Holdings Corp., Nabisco Holdings Corp., Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., and Kraft Foods, Inc.

21.     Mondelez UPF brands include Nabisco, Oreo, Ritz, Triscuit, Wheat Thins, Chips Ahoy!, Honey Maid, Cadbury, Sour Patch Kids, Tang, Toblerone, Belvita, Cote d'Or, Swedish Fish, Cheese Nips, Lorna Doone, Fig Newtons, Nilla Wafers, Nutter Butter, and Teddy Grahams.

22.     Defendant Post Holdings is a Missouri corporation with its principal place of business and headquarters located at 2503 South Hanley Road, St. Louis, Missouri 63144.

23.     Post Holdings is a successor to Philip Morris Companies, Inc., Altria Group, Inc., Kraft General Foods Inc., Kraft Foods Group, Inc., and Kraft Foods, Inc.

-4-

24. Post Holdings UPF brands include Alpen, Chips Ahoy, Coco Wheats, Golden Crisp, Honey Bunches of Oats, Honeycomb, Honey Maid, Honey Ohs, Oreo O's, Pebbles, Puffins, Raisin Bran, and Waffle Crisp.

25. Defendant Coca-Cola is a Delaware corporation with its principal place of business and headquarters located at One Coca-Cola Plaza, Atlanta, Georgia 30313.

26. Coca-Cola UPF brands include Coca-Cola, Diet Coke, Coke Zero, Sprite, Fanta, Fresca, Barq's, Minute Maid, FuzeTea, Peace Tea, Powerade, Schweppes, Vitamin Water, Body Armor, Dunkin Donuts Bottled, Mr. Pibb, Nestea, and Tab.

27. Defendant PepsiCo is a North Carolina corporation with its principal place of business and headquarters located at 700 Anderson Hill Road, Purchase, New York 10577.

28. PepsiCo UPF brands include Pepsi, Mountain Dew, 7UP, Sierra Mist, Starry, Mug, Tropicana, Starbucks Bottled, Gatorade, Propel, Crush, Dr. Pepper, Schweppes, Brisk, Lipton, HiLo, Looza, Maui Style, Cheetos, Chesters, Doritos, Fritos, Lays, Ruffles, Munchies, Munchos, PopCorners, Tostitos, Funyuns, Sabra dips/spreads, Cracker Jack, Rold Gold, SunChips, Cap'n Crunch, Rice-A-Roni, Pasta Roni, Near East, Sobe, Sabritas, Sabritones, Sanitas, Rockstar Energy Drink, Red Rock Deli, Off the Beaten Path, NatuChips, Grandma's, Health Warrior, Propel, and Quaker.

29. Defendant General Mills is a Delaware corporation with its principal place of business and headquarters located at Number One General Mills Boulevard, Minneapolis, Minnesota 55426.

30. General Mills UPF brands include Annie's, Autumn's Gold, Betty Crocker, Bisquick, Boo Berry, Bugles, Cheerios, Chex, Chex Mix, Cinnamon Toast Crunch, Cocoa Puffs, Cookie Crisp, Count Chocula, Dunkaroos, FrankenBerry, Gardetto's, Golden Grahams, Kix, Lucky Charms, Monster Cereals, Nature Valley, Old El Paso, Pillsbury, Progresso, Raisin Nut Bran, Reese's Puffs, Total, Totino's/Jeno's, Trix, Wanchai Ferry, Yoki, and Yoplait.

31. Defendant Nestle is a Delaware corporation with its principal place of business and headquarters located at 812 N. Moore Street, Arlington, Virginia, 22209.

COMPLAINT

32.    Nestle's UPF brands include Stouffer's, DiGiorno, Lean Cuisine, Hot Pockets, Tombstone, Jack's Pizza, Sweet Earth, CPK, Nesquik, Ovaltine, Toll House, Abuelita, Sweet Leaf Tea, Dreyer's/Edy's, Drumstick, and Kit Kats.

33.    Defendant Kellanova is a Delaware corporation with its principal place of business and headquarters located at 412 North Wells Street, Chicago, Illinois 60654.

34.    Defendant WK Kellogg Co. is a Delaware corporation with its principal place of business and headquarters located at One Kellogg Square, Battle Creek, Michigan 49017.

35.    Defendants Kellanova and WK Kellogg Co. were formed in 2023 as successors to Kellogg Company ("Kellogg's") and are collectively referred to herein as "Kellogg's."

36.    Kellogg's UPF brands include Austin Crackers, CheezIt, Club Crackers, Eggo, Grahams Crackers, Kellogg's Waffles, Morning Star Farms, NutriGrain, Pop Tarts, Pringles, Pure Organic, Rice Krispies Treats, Special K, Toasteds, Town House, Zesta Crackers; Frosted Flakes, Froot Loops, Frosted Mini Wheats, Rice Krispies, Raisin Bran, Kashi, Corn Flakes, Corn Pops, Apple Jacks, Cracklin' Oat Bran, Honey Smacks, Krave, Smart Start, Crispix, Vector, and Scooby Doo Cereal.

37.    Defendant Mars is a Delaware corporation with its principal place of business and headquarters located at 6885 Elm Street, McLean, Virginia 22101.

38.    Mars UPF brands include 3 Musketeers, Balisto, Bounty, Celebrations, Combos, Dove, Galaxy, Ethel M, Life Savers, M&M's, Maltesers, Mars, Milky Way, Nature's Bakery, Skittles, Snickers, Starburst, Tru Fru, Twix, Dolmio, and Kevin's.

39.    Defendant ConAgra is a Delaware corporation with its principal place of business and headquarters located at 222 West Merchandise Mart Plaza, Suite 1300, Chicago, Illinois 60654.

40.    ConAgra UPF brands include Slim Jim, Healthy Choice, Duncan Hines, Hunt's, Hebrew National, Hungry-Man, Kid Cuisine, Gardein, Marie Callender's, Reddi Whip, Duke's, Orville Redenbacher's, Act II, Jiffy Pop, Andy Capp's, Armour, Bertolli, Swiss Miss, Snack Pack, Banquet, Celeste Pizza, Chef Boyardee, Crunch 'n Munch, Fiddle Faddle, Alexia, Blake's, Blue Bonnet, Dennison's, Manwich, Brook's, Duke's, Earth Balance, Log Cabin, Mrs. Butterworth's, PF Chang Home Menu, Parkay, Poppycock, Ro-tel, Evol, Fleischmann's, Frontera, La Choy,

Libby's, Mrs. Paul's, Nalley, Tennessee Pride, Big Mama Sausage, Tijuana Mama Sausage, Sandwich Bros, Van Camp's, Van de Kamp's, Wishbone, and Wolf.

41.    Upon information and belief, Defendants Does 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of UPF. The identities of Does 1-50 are unknown to Plaintiff at this time.  Plaintiff will move the Court to specifically name Does 1-50 as their identities become known to Plaintiff through discovery.

42.    Each Defendant, directly or through parents, subsidiaries, affiliates, agents, and contractors, participated in or controlled the design, formulation, marketing, labeling, and warnings for the UPF at issue.  Defendants acted as agents of one another within the scope of their agencies; certain Defendants are successors/alter egos of others; and each is jointly and severally liable for the acts and omissions alleged herein.  Each and every managing agent, agent, representative, and/or employee of each of the Defendants was working within the course and scope of that agency, representation, and/or employment with the knowledge, consent, ratification, and authorization of each of the Defendants and their directors, officers, and/or managing agents.

## JURISDICTION AND VENUE

43.    The California Superior Court has jurisdiction over this action pursuant to Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts."  The statutes under which this action is brought do not specify any other basis for jurisdiction.

44.    Defendants are subject to personal jurisdiction in accordance with Code of Civil Procedure Section 410.10, the California long-arm statute. Defendants purposefully availed themselves of the benefits, profits and privileges derived from their business activities in this state.

45.    The non-resident Defendants regularly engage in business within the State of California. Moreover, Defendants solicited business and engaged in persistent courses of conduct here and derived substantial revenue from goods used and services rendered in the State of California through interstate commerce.

46.    Defendants are regularly engaged in the business of manufacturing and distributing UPF, either directly or indirectly through third-party related entities, in the State of California and, specifically, in San Francisco. Defendants' activities in San Francisco in connection with the manufacture and distribution of UPF was, and is, continuous and systematic, and gave rise to the causes of action alleged herein.

47.    Venue is proper in this Court pursuant to Code of Civil Procedure Section 395(a) because Defendants' unlawful, unfair, and/or fraudulent conduct occurred in the City and County of San Francisco, and a substantial part of the events or omissions giving rise to the People's claims occurred here.

48.    Plaintiff seeks relief that is within the jurisdictional limits of the Court and has suffered damages that exceed the jurisdictional minimum.

## STATEMENT OF FACTS

### I.    What Are Ultra-Processed Foods?

49.    UPF are fundamentally different than the foods that make up traditional diets.  A UPF is the result of combining, using a series of mechanized processes, cheap ingredients with enhancers, and additives with little to no food uses outside of processing.[9]

50.    UPF are formulations of ingredients, mostly of exclusive industrial use, which are created by series of industrial techniques and processes.[10]

51.    Ingredients characteristic of UPF are either food substances of no or rare culinary use, or classes of additives whose function is to make the final product sellable and often hyper-

---

[9] Jean-Claude Moubarac et al., *Ultra-Processed Food and Drink Products in Latin America: Trends, Impact on Obesity, Policy Implications* (Pan Am. Health Org. 2015 Carlos A. Monteiro et al., *Ultra-Processed Foods, Diet Quality and Human Health Using the NOVA Classification System* (Food and Agric. Org. of the U.N. 2019); Carlos A. Monteiro et al., *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019; Carlos A. Monteiro et al., *UN Decade of Nutrition, the NOVA Food Classification and the Trouble with Ultra-Processing*, 21 Public Health Nutr. 5 (2018).

[10] Carlos A. Monteiro et al., *Ultra-Processed Foods, Diet Quality and Human Health Using the NOVA Classification System* (Food and Agric. Org. of the U.N. 2019)Carlos A. Monteiro, *et al.*, *Ultra-processed foods, diet quality and human health*, Food and Agriculture Organization of the United Nations, 2019.

-8-

COMPLAINT

palatable.[11]  These include food substances such as high-fructose corn syrup, maltodextrin, dextrose, lactose, hydrogenated or interesterified oils, hydrolyzed proteins, soy protein isolate, mechanically separated meat emulsifiers, flavor additives, color additives, artificial sweeteners, thickeners, and textural agents.[12]

52.    These components are assembled into a final food product using industrial processes which most American consumers have never heard of (such as extrusion, molding, hydrogenation, hydrolyzation, and pre-frying, each of which further transform the chemical makeup of UPF).[13]

53.    "Ultra-processed Foods" is defined by the NOVA Classification System ("NOVA"), led by epidemiologist Carlos Monteiro.  NOVA's definition of UPF is widely used in the international scientific community.

54.    NOVA classifies foods into four groups based on the extensiveness of processing (including the extensiveness of processing of the final food product's *ingredients*), without regard to the food's nutrient composition.

55.    NOVA Group 1 is "Unprocessed and Minimally Processed Foods," such as unprocessed meats and vegetables, as well as minimally processed foods that have been altered by removal of inedible or unwanted parts, or by processes such as drying, crushing, grinding, powdering, fractioning, filtering, roasting, boiling, non-alcoholic fermentation, pasteurization, chilling, freezing, placing in containers and vacuum packaging.[14]  NOVA Group 2 is "Processed Culinary Ingredients," substances such as oils, butter, lard, sugar and salt that are derived from Group 1 foods by processes such as pressing, refining, grinding, milling and drying.[15]  NOVA Group 3 is "Processed Foods," which are made by adding salt, oil, sugar or other substances from Group 2 foods to Group 1 Foods, such as canned vegetables or legumes preserved in bring, fruit

---

[11] *Id.*

[12] Carlos A. Monteiro et al., *Ultra-Processed Foods, Diet Quality and Human Health Using the NOVA Classification System* (Food and Agric. Org. of the U.N. 2019); Carlos A. Monteiro, *et al.*, *UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing*, Public Health Nutr. (Jan. 2018).

[13] *Id.*

[14] *Id.*

[15] *Id.*

-9-

COMPLAINT

preserved in syrup, tinned fish preserved in oil, ham, bacon, pastrami, smoked fish, freshly baked breads, and cheeses.

56.    NOVA Group 4 is "Ultra-processed Foods."  Unlike NOVA Groups 2 and 3, UPF are not merely modified foods. Instead, they are formulations of often chemically manipulated cheap ingredients with little if any whole food added, made palatable and attractive by using combinations of flavors, colors, emulsifiers, thickeners, and other additives.[16]

57.    The California Legislature has recognized the dangers of UPF.  Consistent with the NOVA's UPF definition, the Real Food, Healthy Kids Act, which Governor Newsom signed into law on October 8, 2025, defines UPF as foods that contain additives, such as thickeners, emulsifiers, flavor enhancers, or other chemical agents—and also high amounts of saturated fat, sodium, added sugar, or nonnutritive sweeteners.[17]

58.    Both the NOVA definition and California definition encompass the UPF at issue in this case, including the brands identified in Paragraphs 16, 19, 22, 25, 27, 29, 31, 33, 37, 39, and 41.[18]

59.    UPF as defined by the NOVA Classification System has been the subject of scientific research over the last fifteen years.  The consensus from the international scientific community is that UPF are uniquely dangerous to our health—no matter how healthy they may seem to the ordinary consumer or what nutritious value they may offer—because of their industrially-processed ingredients, including additives and synthetic chemical agents.[19]

---

[16] Carlos A. Monteiro et al., *Reasons to Avoid Ultra-Processed Foods*, 384 BMJ q 439 (2024).

[17] *See* Cal. Assemb. B. 1264, 2025–2026 Reg. Sess. (Cal. 2025).

[18] For avoidance of doubt, this Complaint does not assert claims about substances from NOVA Categories 1, 2, or 3, such as raw foods (fruit, vegetables, or meats in their natural state), foods that have been modified in a way that does not alter their inherent character (such as by cooling, refrigeration, freezing, peeling, slicing, dicing, cutting, chopping, shucking, grinding, forming into patties without additives or filler, dehydration, packaging, vacuum packing and bagging, butchering meat, cleaning fish, or pasteurizing milk), or foods that have been smoked, roasted, or fermented. This Complaint, likewise, does not assert claims concerning foods provided in a medical context for the purposes of treating or ameliorating a medical condition.

[19] Carlos A. Monteiro et al., *Ultra-Processed Foods*, *Diet Quality and Human Health Using the NOVA Classification System* (Food and Agric. Org. of the U.N. 2019); Food, Diet & Obesity Comm., *Corrected Oral Evidence: Food, Diet and Obesity, Evidence Session 11, Question 147*

***Footnote continued on next page***

COMPLAINT

60.    Indeed, just last year, the World Health Organization ("WHO") and the Food and Agriculture Organization of the United Nations ("FAO") issued a joint statement recognizing that "[a] large and growing body of evidence suggests that consumption of highly processed foods described as 'ultra-processed' foods (UPF) by the NOVA classification scheme (NOVA classification group 4) is associated with negative health outcomes."[20]

61.    The joint statement noted the "evidence suggests that the associations with negative health effects go beyond their fat, sodium, and sugar content," and that health risks include "premature mortality, cancer, cardiovascular diseases, [ ], obesity, and type 2 diabetes, as well as impaired mental, respiratory and gastrointestinal health."[21]  Similarly, UNICEF's Global Director for Child Nutrition and Development just last month urged that "[t]he threshold for action to protect children from UPFs has already been decisively met across countries of all income levels—particularly given the ethical imperative created by children's vulnerability."[22]

62.    Based on this body of research, and as further explained below, scientific consensus has emerged that UPF are uniquely harmful and cause massive increases in chronic diseases.

63.    Public health authorities have taken notice.  Francis Collins, former Director of the United States National Institutes of Health ("NIH") recommended that Americans should "work to eliminate or at least reduce ultra-processed foods in your diet."[23]

64.    Health authorities from countries around the world—including at least Argentina, Australia, Brazil, Canada, Chile, Ecuador, France, India, Israel, Malaysia, the Maldives, Peru, and Uruguay—have issued similar admonitions to their citizens concerning the dangers of UPF.

---

(House of Lords Mar. 2024); Tara Parker-Pope, How the Food Makers Captured Our Brains, *N.Y. Times* (June 22, 2009); Carlos A. Monteiro et al., *Ultra-Processed Foods and Human Health: The Main Thesis and the Evidence*, The Lancet (Nov. 18, 2025).

[20] World Health Org. & Food & Agric. Org. of the U.N., *What Are Healthy Diets? Joint Statement by the Food and Agriculture Organization of the United Nations and the World Health Organization* (2024).

[21] *Id.*

[22] Joan N Matji et al., *Protecting Children from Ultra-Processed Foods*, The Lancet (Nov. 18, 2025).

[23] Francis S. Collins, *How Ultra-Processed Foods Affect Our Health,* NIH Director's Blog (Mar. 6, 2024).

-11-

## II.    UPF Are Dangerous: "No reason exists to believe that humans can fully adapt to these products."[24]

65.    A robust body of scientific literature demonstrates that UPF are not metabolized by humans or stored in our bodies in the same ways that non-UPF are.[25]

66.    Instead, UPF impair and damage biological systems in unique ways, independent of the calorie, sugar, saturated fat, cholesterol, sodium, fiber, mineral, or other nutrient content of the UPF.[26]

67.    A randomized-controlled trial ("RCT") conducted by the National Institutes of Health ("NIH") meticulously matched the diets of inpatient subjects by nutritional composition, with one group receiving a UPF diet and the other group receiving a diet of non-UPF that had the same proportions of calories, sugar, fat, fiber, carbohydrates, and other macronutrients as the UPF diet.[27]  The group receiving the UPF diet consumed over 500 calories more each day and gained approximately one pound each week.[28]  By contrast, the group receiving food that was non-UPF lost weight.[29]

68.    A second RCT, with a similar design, confirmed these results, finding that individuals fed a UPF diet consumed 813.5 more calories per day and gained an average of 1.2 pounds each week, compared to those fed a non-UPF diet.[30]

69.    A third RCT found that UPF increased body weight and altered cholesterol ratios independently of caloric intake.[31]  In other words, the group that consumed UPF gained weight and

[24] Carlos A, Monteiro et al., *Reasons to Avoid Ultra-Processed Foods*, 384 BMJ q 439 (2024).

[25] Jessica Preston et al., *Effect of Ultra-Processed Food Consumption on Male Reproductive and Metabolic Health*, Cell Metab. (published online and ahead of print Jan. 7, 2025).

[26] Carlos A. Monteiro, et al., *Impact of Food Ultra-Processing on Cardiometabolic Health: Definitions, Evidence, and Implications for Dietary Guidance*, J Am Heart Assoc. (forthcoming 2024).

[27] Kevin D. Hall et al., *Ultra-processed Diets Cause Excess Calorie Intake and Weigh Gain: An Inpatient Randomized Controlled Trial of Ad Libitum Food Intake*, 30 Cell Metab. 67 (2019).

[28] *Id.*

[29] *Id.*

[30] Shoko Hamano et al., Ultra-Processed Foods Cause Weight Gain and Increased Energy Intake Associated with Reduced Chewing Frequency: A Randomized, Open-Label, Crossover Study, Diabetes Obes. Metab. e5206 (2024).

[31] J. Preston et al., Effect of Ultra-Processed Food Consumption on Male Reproductive and Metabolic Health, Cell Metab. (published online and ahead of print Jan. 7, 2025).

-12-

COMPLAINT

fat mass, relative to the group that did not consume UPF—even though both groups consumed the same number of calories.  Disturbingly, the subjects eating UPF also had altered levels of cholesterol as well as increased depression scores, and, where the subjects were male, incidents of decreased sperm health.[32]  This RCT also found that UPF diets inhibited subjects' metabolisms.[33]

70.    The authors of this NIH RCT, considering the accumulated evidence, concluded that "the processed nature of [UPF] itself, independent of the caloric and macronutrient intake, impacts numerous health markers" and that "our results demonstrate that consumption of UPF itself, *irrespective of excess caloric intake*, is detrimental to human health"[34] (emphasis added).

71.    Ultra-processing disrupts the nutrient balance that humans are genetically adapted to consume, and a growing body of evidence suggests the human metabolism is not be able to properly process nutrient distributions that substantially deviate from the range and structure of nutrient distributions in foods found in nature, known as the "food matrix."[35]  Put simply, UPF bypass the signals our bodies send us that we are full and we can stop eating.[36]

72.    High-quality scientific studies with large representative samples have also found that consuming UPF significantly increases risks of a host of serious health problems, including

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] Anthony Fardet, *Minimally Processed Foods Are More Satiating and Less Hyperglycemic than Ultra-Processed Foods: A Preliminary Study with 98 Ready-to-Eat Foods*, 7 Food Funct. 233 (2016); Anthony Fardet & Edmond Rock, Reductionist Nutrition Research has Meaning Only within the Framework of Holistic and Ethical Thinking, 9 Adv Nutr. 655 (2018); Anthony Fardet et al., *Beyond Nutrient-Based Food Indices: A Data Mining Approach to Search for a Quantitative Holistic Index Reflecting the Degree of Food Processing and Including Physicochemical Properties*, 9 Food Funct. 364 (2018).

-13-

COMPLAINT

breast,[37] colorectal,[38] pancreatic,[39] lung,[40] and brain cancer[41]; cardiovascular disease,[42] irritable bowel disease,[43] chronic kidney disease,[44] Crohn's disease,[45] chronic inflammation,[46] Type 2

[37] Thibault Fiolet et al., *Consumption of Ultra-Processed Foods and Cancer Risk*, 360 BMJ j322 (2018); Irja M. Isaksen et al., *Ultra-Processed Food Consumption and Cancer Risk: A Systematic Review and Meta-Analysis*, 42 Clin. Nutr. 1080 (2023);.Long Shu et al., *Association Between Ultra-Processed Food Intake and Risk of Breast Cancer: A Systematic Review and Meta-Analysis of Observational Studies*, 10 Front Nutr. 1268470 (2023).

[38] Lu Wang et al., *Association of Ultra-Processed Food Consumption with Colorectal Cancer Risk Among Men and Women: Results From Three Prospective US Cohort Studies*, 379 BMJ e071308 (Aug. 2022); Long Shu et al., *Association Between Ultra-Processed Food Intake and Risk of Colorectal Cancer: A Systematic Review and Meta-Analysis*, 10 Front Nutr. 1207804 (Jul. 2023); Ying Lian et al., *Association Between Ultra-Processed Foods and Risk of Cancer: A Systematic Review and Meta-Analysis*, 10 Front. Nutr. 1202987 (2023); Rocio Caceres-Matos et al., *The Influence of Ultra-Processed Food on Colorectal Cancer: A Systematic Review*, 6 Gastrointest. Disord. 18 (2024).

[39] Guo-Chao Zhong et al., *Ultra-Processed Food Consumption and the Risk of Pancreatic Cancer in the Prostate, Lung, Colorectal and Ovarian Cancer Screening Trial*, 152 Int'l J. Cancer 1003 (2023).

[40] Kiara Chang et al., *Ultra-Processed Food Consumption, Cancer Risk and Cancer Mortality: A Large-Scale Prospective Analysis Within the UK Biobank*, 56 eClinicalMedicine 101840 (2023).

[41] *Id.*

[42] *E.g.*, Bernard Srour et al., *Ultra-Processed Food Intake and Cardiovascular Disease: Prospective Cohort Study*, 365 BMJ l1451 (2019); Marialaura. Bonaccio et al., *Joint Association of Food Nutritional Profile by Nutri-Score Front-of-Pack Label and Ultra-Processed Food Intake With Mortality: Moli-Sani Prospective Cohort Study*, 378 BMJ e070767 (2022); Xuanli Chen et al., *Associations of Ultra-Processed Food Consumption With Cardiovascular Disease and All-Cause Mortality*: UK Biobank, 32 Eur. J. Pub. Health 846 (2022).

[43] Neeraj Narula et al**.,** *Association of Ultra-Processed Food Intake With Risk of Inflammatory Bowel Disease: Prospective Cohort Study*, 374 BMJ n1554 (2021); Laure Schnabel et al**.,** *Association Between Ultra-Processed Food Consumption and Functional Gastrointestinal Disorders: Results From the French NutriNet-Santé Cohort*, 113 Am. J. Gastroenterol (2018); Shanhan Wu et al., *Ultra-Processed Food Consumption and Long-Term Risk of Irritable Bowel Syndrome: A Large-Scale Prospective Cohort Study*, 22 Clin. Gastroenterol. Hepatol. 1497 (2024).

[44] Bingjie. Xiao et al., *Ultra-processed Food Consumption and the Risk of Incident Chronic Kidney Disease: A Systematic Review & Meta-Analysis of Cohort Studies*, 46 Ren. Fail. 2306224 (2024).

[45] Neeraj Narula et al**.,** *Association of Ultra-Processed Food Intake With Risk of Inflammatory Bowel Disease: Prospective Cohort Study*, 374 BMJ n1554 (2021); Chun-Han Lo et al., *Ultra-Processed Foods and Risk of Crohn's Disease and Ulcerative Colitis: A Prospective Cohort Study*, 20 Clin. Gastroenterol. Hepatol. e1323 (2022).

[46] *E.g.*, Edwin E. Martínez Leo, *Ultra-Processed Diet, Systemic Oxidative Stress, and Breach of Immunologic Tolerance*, 91–92 Nutrition 111419 (2021); Carmine Stolfi et al., *Impact of Western Diet and Ultra-Processed Food on the Intestinal Mucus Barrier*, 11 Biomedicines 2015 (2023); Marta Asensi et al., *Low-Grade Inflammation and Ultra-Processed Foods Consumption: A Review*, 2023 15 Nutrients 1546 (2023).

-14-

Diabetes,[47] non-alcoholic fatty liver disease,[48] disruption of the endocrine system,[49] depression,[50] and anxiety.[51]

73.    Importantly, these studies control for potential alternative causes of these results other than UPF.  These controls include adjustments for co-morbidities like obesity and behaviors like smoking, as well as for the number of calories and the amount of salt, sugar, fat, and other nutrients consumed.  And, controlling for these other alternatives, what these studies found is that UPF alone are significant drivers of health risks.

74.    Some of these alarming results may be attributable to the fact that many of the ingredients in UPF have not been independently tested for safety.  Defendants have introduced more than 10,000 such chemicals in our food supply in service of producing UPF.[52]

---

[47] *E.g.*, Sajjad Moradi et al., *Ultra-Processed Food Consumption and Adult Diabetes Risk: A Systematic Review and Dose-Response Meta-Analysis*, 13 Nutrients 4315 (2021); Felipe M. Delpino et al., *Ultra-Processed Food and Risk of Type 2 Diabetes: A Systematic Review and Meta-Analysis of Longitudinal Studies*, 51 Int'l J. Epidemiol. 1211 (2022); Zhangling Chen et al*., Ultra-Processed Food Consumption and Risk of Type 2 Diabetes: Three Large Prospective U.S. Cohort Studies*, 46 Diabetes Care 1441 (2023).

[48] Longgang Zhao et al., *Higher Ultra-Processed Food Intake Is Positively Associated With Odds of NAFLD in U.S. Adolescents and Adults: A National Study*, 7 Hepatol. Commun. e0135 (2023); Longgang Zhao et al., *Higher Ultra-Processed Food Intake Is Associated With Adverse Liver Outcomes: A Prospective Cohort Study of UK Biobank Participants*, 118 Am. J. Clin. Nutr. 771 (2023); Yi-Fend Zhang et al., *Association of Ultra-Processed Food Intake With Severe NAFLD*, 28 J. Nutr. Health Aging 123 (2024).

[49] *E.g.*, Constanze Stiefel et al., *Endocrine Active and Endocrine Disrupting Compounds in Food*, 32 NFS J. 1 (2023); E. Chazelas et al., *Food Additives: Distribution and Co-Occurrence in 126,000 Food Products of the French Market*, 10 Sci. Rep. 7490 (2020); Hai-Tai Gao et al., *Food Emulsifier Glycerin Monostearate Increases Internal Exposure Levels of Six Priority Controlled Phthalate Esters and Exacerbates Their Male Reproductive Toxicities in Rats*, 11 PLoS One e0160519 (2016); Beatrice Dufrusine et al., *Influence of Food Emulsifiers on Cellular Function and Inflammation*, 10 Front. Nutr. 1223591 (2023).

[50] Melisa M. Lane et al., *Ultraprocessed Food Consumption and Mental Health: A Systematic Review and Meta-Analysis of Observational Studies*, 14 Nutrients 2742 (2022).

[51] *Id.*

[52] Maricel V. Maffini et al., *We Are What We Eat: Regulatory Gaps in the United States That Put Our Health at Risk*, 15 PLOS Biol. e2003578 (2017); Olivia Backhaus & Melanie Benesh, EWG Analysis: Almost All New Food Chemicals Greenlighted by Industry, Not the FDA, Env't Working Grp. (Apr. 2022).

-15-

75. Almost none of these chemicals have undergone long-term testing to determine whether they are safe to be chronically consumed. In fact, the available evidence suggests that many of these chemicals may be toxic even at exceedingly low levels.[53]

76. Additives present in UPF, such as emulsifiers, preservatives, dyes, stabilizers, thickening agents, and surfactants have also been shown to cause harm inside the human body.[54]

77. Studies show that additives such as emulsifiers, artificial sweeteners and colors, and other cosmetic additives disrupt the types and numbers of microorganisms in the body's microbiome and cause inflammation. These effects cause significant harm to multiple systems within the human body including chronic illnesses.[55]

78. Studies also show that the methods of ultra-processing cause UPF to be contaminated with substances suspected to be carcinogens or to disrupt the functioning of the endocrine system (for instance, acrylamide, bisphenols, and phthalates).[56] This is likely due to the materials used to the high heats and moisture extraction used in ultra-processing, as well as the materials used in ultra-processing. Because UPF causes toxicity in multiple ways and consist of substances that have been alien to all prior human experience, "[n]o reason exists to believe that humans can fully adapt to these products."[57]

---

[53] Maricel V. Maffini et al., *We Are What We Eat: Regulatory Gaps in the United States That Put Our Health at Risk*, 15 PLOS Biol. e2003578 (2017); Clara Salame et al., *Food Additive Emulsifiers and the Risk of Type 2 Diabetes: Analysis of Data From the NutriNet-Santé Prospective Cohort Study*, 12 Lancet Diabetes Endocrinol. 310 (2024).

[54] *E.g.*, Constanze Stiefel et al., *Endocrine Active and Endocrine Disrupting Compounds in Food*, 32 NFS J. 1 (2023); Eloi Chazelas et al., *Food Additives: Distribution and Co-Occurrence in 126,000 Food Products of the French Market*, 10 Sci. Rep. 7490 (2020); Hai-Tao Gao et al., *Food Emulsifier Glycerin Monostearate Increases Internal Exposure Levels of Six Priority Controlled Phthalate Esters and Exacerbates Their Male Reproductive Toxicities in Rats*, 11 PLoS One e0160519 (2016).

[55] Mona S. Calvo et al., *Industrial Use of Phosphate Food Additives: A Mechanism Linking Ultra-Processed Food Intake to Cardiorenal Disease Risk?*, 15 Nutrients 3374 (2023); Marta Asensi et al., *Low-Grade Inflammation and Ultra-Processed Foods Consumption: A Review*, 2023 15 Nutrients 1546 (2023).

[56] Carlos A. Monteiro et al., *Impact of Food Ultra-Processing on Cardiometabolic Health: Definitions, Evidence, and Implications for Dietary Guidance*, J Am Heart Assoc. (forthcoming 2024).

[57] Carlos A. Monteiro et al., *Reasons to Avoid Ultra-Processed Foods*, 384 BMJ q 439 (2024).

COMPLAINT

79.     The adverse effects of UPF are only compounded by the fact that Defendants have engineered UPF to be overconsumed.

**III.     UPF—Like Tobacco and Illegal Drugs—Are Addictive.**

80.     The Defendants have created and continue to create addictive substances by processing naturally occurring substances into products with unnaturally high doses of "reinforcing" ingredients—ingredients that enhance the rewarding effects of the substance.  These products are typically combined with other additives that further enhance their rewarding effects (*e.g.*, menthol in cigarettes) and, therefore, their addictive potential.

81.     Historically, the "addictive" label was mostly applied to substances such as alcohol and heroin, which clearly caused mind-altering intoxication and adverse physical symptoms with withdrawal.[58]

82.     In 1988, however, the U.S. Surgeon General broadened the conceptualization of addiction, issuing a report identifying tobacco products as addictive for the first time.  He based his conclusions on ***three primary scientific criteria***: a substance's ability: (1) to cause compulsive use; (2) to cause psychoactive (*i.e.*, mood-altering) effects via their effect on the brain; and (3) to reinforce behavior.[59]  Each of these characteristics are evident in UPF.

83.     None of the components of the Surgeon General's definition require intoxication or withdrawal in the absence of the substance at issue.  UPF, like tobacco, do not acutely trigger intoxication and do not cause life-threatening physical withdrawal symptoms.

**A.     UPF Cause Compulsive Use in the Same Ways as Other Addictive Substances.**

84.     The first characteristic of addictiveness identified by the U.S. Surgeon General is a substance's ability to cause compulsive use.  Compulsive use of tobacco in the U.S. Surgeon General's Report was demonstrated by evidence that most smokers would like to quit but were unable to do so—even in extreme cases where individuals experiencing significant smoking-related disease (*e.g.,* cancer and cardiovascular disease) continue smoking.[60]

---

[58] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021).

[59] *Id.*

[60] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, 8 Curr. Behav. Neurosci. Rep. 19 (2021).

85.    Similarly, here, even in the face of significant diet-related health consequences (*e.g.,* diabetes and cardiovascular disease), the majority of patients suffering from these life-threatening diseases are unable to adhere to medically recommended dietary plans that require a reduction of UPF intake.[61]  People are prone to compulsively consume UPF even in the face of significant and life-threatening negative consequences.[62]

86.    One of the most commonly cited obstacles for these patients are self-reported cravings for UPF.[63]   Reported cravings in response to UPF cues—including marketing and promotion—drive UPF consumption and addiction.[64]  These cravings occur even when individuals should feel full.[65]   And the sensation of feeling full (or satiety) is adversely impacted by the consumption of UPF.[66]  The result can be a descent into consumption of ever-increasing amounts of UPF—despite a desire or even repeated attempts to quit.[67]

---

[61] *Id.*

[62] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[63] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[64] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[65] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[66] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[67] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

COMPLAINT

87.    As an extreme example of this, some individuals with severe obesity are treated with gastric bypass surgery, where the stomach is stapled to restrict the volume of food that can be eaten. Approximately 20-50% of individuals who undergo this surgery will "eat through" it and continue to excessively ingest UPF.[68]  This intake persists despite the consumption of UPF triggering immediate aversive physical symptoms (*e.g.*, cramping, vomiting, and diarrhea) when consumed after gastric bypass.[69]

88.    As another example, a review of a sample set of food diaries of individuals with eating disorders found, incredibly, that *100% of the foods the individuals reported consuming during binge episodes* were UPF.[70]  Binge eating is inversely associated with minimally processed foods, whereas UPF are positively associated with binge eating.[71]

89.    Tellingly, rodents will risk aversive experiences (*e.g.*, electric shock) to consume UPF (in the form of industrially-produced sweets) when other calorie sources are easily available to them.[72]  Rats even show greater resistance to electric shock when attempting to access industrially-produced sweetener than when *they are attempting to access methamphetamine*.[73] Non-UPF do not elicit these responses in humans or rodents.[74]

90.    Recent studies confirm that UPF drive neurobiological and behavioral changes leading to compulsive use in the same ways addictive drugs do.  For example, neuroimaging studies show UPF triggers similar reward-related neural responses (as well as emotional dysregulation and

[68] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[69] Ashley N. Gearhardt & Erica M. Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021); Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[70] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, 91 Psychother. Psychosom. 357 (2022).

[71] *Id.*

[72] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[73] *Id.*

[74] *Id.*

impulsivity) as other addictive substances, such as cocaine and cigarettes.[75]  UPF are also widely associated with elevated responses in brain regions related to desire and reward, such as the dorsal striatum, nucleus accumbens ("NAc"), and orbitofrontal cortex.[76]  These are the same neural patterns commonly observed in people addicted to drugs.

91.    Incredibly, naltrexone, which is used to treat opioid use disorder, and pexacerfont, which is used to treat heroin and methamphetamine addiction, are effective in reducing cravings for UPF.[77]  This suggests that UPF cravings are mediated through the reward center of the prefrontal cortex.[78]

92.    Non-UPF do not trigger these neurological responses.[79]

**B.    UPF Are Psychoactive Substances.**

93.    The second characteristic of addictiveness identified by the U.S. Surgeon General is psychoactivity, defined as "transient alterations in mood that are primarily mediated by effects in the brain."[80]  UPF readily meets this criteria as well.  UPF has the same effect on consumers as other substances labeled psychoactive.[81]  For example, ultra-processed sweets are associated with similar measures of psychoactive drug effects as the administration of 1.5 mg of intravenous nicotine.[82]

94.    UPF and its components increase dopamine at a similar rate and magnitude as nicotine, even when not consumed orally.  For instance, when UPF was surgically inserted into

---

[75] Erica M. LaFata et al., *Ultra-Processed Food Addiction: A Research Update*, 13 Curr. Obes. Rep. 214 (2024); Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, 8 Curr. Behav. Neurosci. Rep. 19 (2021).

[76] *Id.*

[77] Erica M. LaFata et al., *Ultra-Processed Food Addiction: A Research Update*, 13 Curr. Obes. Rep. 214 (2024).

[78] *Id.*

[79] Erica M. Schulte et al., *Advances in the Neurobiology of Food Addiction*, 8 Curr. Behav. Neurosci. Rep. 19 (2021).

[80] Ashley N. Gearhardt & Alexandra G. DiFeliceantonio, *Highly Processed Foods Can Be Considered Addictive Substances Based on Established Scientific Criteria*, 117 Addiction 3222 (2022).

[81] *Id.*

[82] *Id.*

-20-

COMPLAINT

patients' guts, dopamine levels increased from 150-200%.[83]  The observed response was not dependent on tasting, smelling, or even touching the substance.  Rather, the response was a chemical reaction that occurred inside the patients' bodies when exposed to the substance.

95.    Further, intake of UPF is often motivated by a desire to alter mood rather than to satisfy hunger or to slake thirst.[84]

**C.    UPF Are Reinforcing.**

96.    The third characteristic of addictiveness identified by the Surgeon General is "being sufficiently rewarding to maintain self-administration."[85]  This is known as being "reinforcing."

97.    The reinforcing nature of UPF is high—studies show that both adults and children will reach for UPF even when they are no longer hungry.[86]  In contrast, the tendency to consume non-UPF when satiated is much lower.[87]

98.    Studies have also shown that individuals who consume UPF daily develop an increased willingness to work to gain access to UPF over time—even when non-UPF are available.  This suggests that consumption of UPF over time sensitizes individuals to the reinforcing value of UPF, and larger portions lead to greater sensitization.[88]  In contrast, there is no evidence that daily exposure to non-UPF sensitizes reinforcing value.  In fact, daily exposure to non-UPF may even *reduce* cravings.[89]

99.    When researchers have studied UPF consumption in animals, they have observed UPF are reinforcing in the same way that nicotine is.[90]  But, shockingly, animals will seek out UPF in a much wider range of conditions than nicotine.[91]

---

[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*

-21-

100.    Having reviewed this evidence of the reinforcing characteristics of UPF, Dr. Robert Califf, the Commissioner of the United States Food and Drugs Administration ("FDA"), testified that UPF are "probably addictive."[92]  Commissioner Califf explained that

> …the food industry has figured out that there is a combination of sweet, carbohydrate, and salt that goes to our brains and is very--I think it's addictive…that's my opinion.  And I think it's the same neural circuits that are involved in opioid addiction and other kinds of addiction that we have.  They've studied this. Again, we don't have access to their research data like we do in the human medical products arena...[t]here are actually three or four pathways involved here.[93]

101.    Today, 14-20% of adults and 12-15% of children are functionally addicted to UPF.[94] This rate in adults is highly similar to prior addiction epidemics, including tobacco.[95] This is due in no small part to Defendants' concerted efforts.

## IV.    Defendants Designed UPF To Be Addictive to Drive Sales and Profits.

### A.    "[I]n the Flavor Business": Big Tobacco Becomes Big Food.[96]

102.    Early attempts at manufacturing UPF arose around the World Wars of the early 20th Century, largely to respond to wartime shortages. These projects included efforts to create artificial sweeteners from coal tar and Nazi Germany's efforts to create butter substitutes from coal wastes.[97]

---

[92] Testimony of Robert Califf, Comm'r, U.S. Food & Drug Admin., Before the S. Comm. on Health, Educ., Labor & Pensions, What Is the FDA Doing to Reduce the Diabetes and Obesity Epidemics in America and Take On the Greed of the Food and Beverage Industry? (Dec. 5, 2024).

[93] *Id.*

[94] Erica M. LaFata & Ashley N. Gearhardt, *Ultra-Processed Food Addiction: An Epidemic?*, 91 Psychother. Psychosom. 357 (2022).

[95] Ashley N. Gearhardt & Erica M Schulte, *Is Food Addictive?*, 41 Annu. Rev. Nutr. 387 (2021).

[95] Erica M. LaFata et al., *Ultra-Processed Food Addiction: A Research Update*, 13 Curr. Obes. Rep. 214 (2024).

[96] Interoffice Memo, Eldon D. Nielson, Kenneth H. Hoover et al. (Oct. 4, 1962).

[97] Chris van Tulleken, *Ultra-Processed People: The Science Behind the Food*, at 69-73, 90-92, (2023); Butter is Made by Germans from Coal, Eagle Valley Enterprise, September 6, 1946; Made Butter from Coal in Germany, Brisbane Courier-Mail, August 8, 1946; E. Maier, Coal—in Liquid Form, MaxPlanckResearch, Apr. 2016.

-22-

COMPLAINT

103.   Before the 1970s, however, food in the U.S. was largely supplied by smaller, local food producers and regional companies.[98]  In the 1970s and 1980s, however, food companies began consolidating—resulting in increased food processing and distribution.[99]

104.   The "Big Tobacco" companies, R.J. Reynolds and Philip Morris, led this market shift.[100]

105.   R.J. Reynolds first entered the food market in the early 1960s with its acquisition of Hawaiian Punch. In a 1962 internal memo, R.J. Reynolds' Head of Biochemical Research encouraged the company to enter the field of artificial foods, flavors, and fragrances, writing:

> It is easy to characterize R.J. Reynolds merely as a tobacco company.  In a broader and much less restricting sense however, R.J. Reynolds is in the flavor business.
>
> Meanwhile our interests in non-tobacco areas are developing.  It is probable that many flavorants for tobacco will be useful in food, beverage and other products.  If we become a basic producer of tobacco flavorants, we will have started to become a basic producer in the general flavor industry. . .
>
> If R.J. Reynolds were to establish a position in this field now, it would realize large financial returns from these developments.[101]

106.   Over the ensuing fifteen years, R.J. Reynolds acquired several food companies, and by 1979 was boasting of being a "major force in worldwide consumer packaged goods with strong positions in tobacco and foods."[102]

107.   In 1985, R.J. Reynolds purchased Nabisco for $4.9 billion and merged it with Del Monte and the other food and beverage brands it had previously acquired throughout the 1960s and

---

[98] Tena L. Fazzino, *The Reinforcing Natures of Hyper-Palatable Foods: Behavioral Evidence for Their Reinforcing Properties and the Role of the U.S. Food Industry in Promoting Their Availability*, 9 Curr. Addict. Rep. 298 (2022).

[99] *Id.*

[100] *Id.*

[101] Interoffice Memo, Eldon D. Nielson, Kenneth H. Hoover et al. (Oct. 4, 1962).

[102] RJR Foods, Inc. Fact Sheet (Mar. 1978); R.J. Reynolds Tobacco Company, 1979 Annual Report (1979).

-23-

COMPLAINT

1970s.[103]  This acquisition cemented R.J. Reynolds as a tobacco-food behemoth, and "Big Food" was born.

108.    In 1985 Philip Morris joined the trend—purchasing General Foods for $5.6 billion.[104] Philip Morris then purchased Kraft Inc. for $12.9 billion in 1988, making the combined tobacco-food company the world's largest food business and the world's largest consumer products company.[105]  The combined company dominated the market in twenty food categories and had 32 food brands that exceeded $100 million in annual sales.[106]

109.    Philip Morris conquered even more of the U.S. food market in 2000, when it acquired R.J. Reynolds' former food business for $18.9 billion.[107]  It integrated and merged the R.J. Reynolds food companies with its own, creating a company with 73 brands exceeding $100 million in annual sales.[108]

110.    Defendants Kraft Heinz, Mondelez, and Post Holdings are direct descendants of Philip Morris and/or R.J. Reynolds.

**B.    "All of the Pleasure Drugs That Are Not Regulated": Big Food Deploys Addiction Science to Hack the Human Brain.[109]**

111.    Big Tobacco spent decades researching ways to make its products more addictive. When Big Tobacco created Big Food, Big Tobacco put that research straight into the development and marketing of food products.

112.    Philip Morris' Director of Applied Research distilled his company's acquisition philosophy thus: "control all of the pleasure drugs that are not regulated."[110]

[103] Tena L. Fazzino, *The Reinforcing Natures of Hyper-Palatable Foods: Behavioral Evidence for Their Reinforcing Properties and the Role of the U.S. Food Industry in Promoting Their Availability*, 9 Curr. Addict. Rep. 298 (2022).

[104] *Philip Morris Agrees to Buy General Foods*, Chi. Trib., Sept. 28, 1985.

[105] *It's All Over: Philip Morris is New Owner of Kraft*, Chi. Trib., Dec. 9, 1988;

M. Cohen & N. Ghez, *Philip Morris Companies: An In-Depth Analysis of Kraft*, Goldman Sachs U.S. Rsch. (Apr. 1995)

[107] *Philip Morris to Acquire Nabisco*, S. Fla. Sun Sentinel, Jun. 26, 2000.

[108] *Philip Morris Acquires Nabisco for $55 per Share in Cash and Plans for IPO of Kraft*, *Newsbreak Extra!*, Jun. 25, 2000.

[109] P. Callahan et al., *Where There's Smoke, There Might be Food Research, Too*, Chi. Trib., Jan. 29, 2006

[110] *Id.*

-24-

113.   R.J. Reynolds and Philip Morris did not operate their food companies as wholly independent entities but instead rapidly integrated them into the pre-existing tobacco companies.

114.   As a result, there was a systematic transfer of people, knowledge, information, and technologies from "Big Tobacco" to the food and beverage industry in the 1980s, 1990s, and 2000s.[111]  Big Food put the institutional knowledge of these employees to work.

115.   The express goal of R.J. Reynolds' Biochemical & Biobehavioral group was to understand and leverage the addictive qualities of its cigarettes to design other addictive products.

116.   R.J. Reynolds spent hundreds of millions of dollars per year on research and development "opportunities affecting cigarettes and food,"[112] including research into how humans responded to inhaled chemicals and the physiological ways in which humans perceived bitter and sweet flavors.

117.   Likewise, Philip Morris organized the Philip Morris Companies Technical Synergy Group to disseminate formulation and marketing research (including neurological research on sensory perception) to its food companies.[113]  Philip Morris scientists studying nicotine's impact on the brain regularly collaborated with Kraft and General Foods.[114]

118.   For example, Dr. Frank Gullotta was a Philip Morris scientist who supervised a secret Philip Morris addiction laboratory in Germany.[115]  Gullotta's research included using electrodes on human scalps to understand the impact of nicotine consumption on the human brain.[116]  He became integrated in the company's food operations after the acquisition of General Foods and Kraft.[117]

119.   Philip Morris' and Kraft's chemical senses program collaborated on research concerning the human hardware of the central nervous system and designed collaborative studies

[111] V. Gewin, New Archive Reveals How the Food Industry Mimics Big Tobacco to Suppress Science, Shape Public Opinion, Nature, Nov. 28, 2018.

[112] Interoffice Memo, Huntley R. Whitacre, Edward A. Horrigan Jr. et al. (Aug. 9, 1988).

[113] Philip Morris USA, *Appendix A*, *R&D 1991 Accomplishments* (1991).

[114] Delroy Alexander et al., *Craving the Cookie*, Chi. Trib., Aug. 21, 2005.

[115] Patricia Callahan et al., *Where There's Smoke*, *There Might be Food Research*, *Too*, Chi. Trib., Jan. 29, 2006.

[116] Delroy Alexander et al., *Craving the Cookie*, Chi. Trib., Aug. 21, 2005.

[117] Philip Morris USA, *Appendix A*, *R&D 1991 Accomplishments* (1991); Patricia Callahan et al., *Where There's Smoke*, *There Might be Food Research*, *Too*, Chi. Trib., Jan. 29, 2006.

-25-

COMPLAINT

of mutual interest to the cigarette and food operations.[118]  For instance, Philip Morris and Kraft collaborated on research into the "molecular basis for odor/flavor recognition."

120.  The purpose of all this research was not to determine how to make food more flavorful.  The purpose was to understand how to exploit the physiological structures of the human brain, to override the body's natural mechanisms for resisting its addictive qualities, and to evade the body's ability to control intake.[119]

121.  As Dr. Gullotta explained in 1990, the senses of taste, smell, and touch don't "matter a didley if you don't have the effects in the brain.  [Consuming UPF] are only pleasurable because of the consequences" in the brain.[120]

122.  As a clear example of this, Philip Morris and Kraft conducted joint research into "drivers of acceptance, mood or satiety/drinkability" that "are usually not consciously perceived … but are perceived at the receptor level (ex. Pheromones)."[121]  This research was identified as "of common interest to beer, food and tobacco."[122]

123.  Kraft and Philip Morris jointly used "neuroimaging (understanding how olfaction and gustatory information is coded—identify receptor subtypes)" and molecular biology and other sophisticated technologies to formulate UPF products and to create "designer odors and flavors" and the "production of novel aroma compounds."[123]

124.  These and similar technologies and research were broadly applied to product formulation in Philip Morris' UPF division, which later became Defendants Kraft Heinz, Mondelez, and Post Holdings.  Knowledge of the brain's physiological functions was used to hack the human brain and to formulate UPF that could evade people's bodily mechanisms for controlling intake.

---

[118] Interoffice Memo, F. P. Gullotta, Dr. R. A Carchman (Mar. 22, 1991).

[119] Chris van Tulleken, *Ultra-Processed People: The Science Behind the Food* at 151-171 (2023); Robert Lustig, *The Hacking of the American Mind* (2017).

[120] *Appendix A Chemical Senses Symposium, Meeting Minutes* (Apr. 1990).

[121] Interoffice Memo, Chemoreception Research (Feb. 12, 1998) (*emphasis in original*).

[122] *Id.*

[123] Interoffice Memo, Arthur Anderson, Phillip Morris Technology Synergy Team (Oct. 2, 1997).

125.    Many UPF also directly incorporated tobacco product additives in their formulations.  For example, R.J. Reynolds used the company's tobacco flavor library to create beverage formulas.[124]  The stated goal "is to leave people wanting more."[125]

126.    As market leaders, "Big Tobacco" quickly spread this research and formulation strategy, and such strategies are now prevalent throughout the UPF (Big Food) industry.

127.    Each of the Defendants has spent considerable resources engaging internal scientists and third-party research firms to conduct sophisticated research with the intent of hacking human biological instincts and processes and driving increased consumption of their UPF.

128.    Defendants' in-house capabilities alone are mind-boggling:

(a)    Nestle currently employs numerous sensory psychologists to study issues relating to brain activity, including the use of electroencephalography, and "taste development, perception and food preference in young children."[126]  Nestle has even begun using consumer DNA and artificial intelligence to formulate new products.[127]

(b)    As another example, PepsiCo utilizes functional magnetic resonance imaging (fMRI), a neuroimaging technique that measures human brain activity by detecting changes in blood flow, to guide product formulation design.[128]  PepsiCo has also used marketing campaigns designed using biosensory research about consumers.  This so-called "neuromarketing" strategy was a key component of its "Orange Underground" campaign to increase total sales for its billion-dollar brand, Cheetos.[129]

---

[124] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, 364 BMJ l736 (2019); Charles Milton, *Monthly Research Report: Technical Development Division* (R.J. Reynolds, No. 5, 1962)

[125] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, 364 BMJ l736 (2019).

[126] Nestlé, *Consumers Find an Unfamiliar Taste More Enjoyable After Looking at Food That Appeals to Them* (Mar. 2012); Catherine Forestell, *Video Teaser: Taste Development, Perception and Food Preference in Young Children* (Nestlé Nutrition Inst. Nov. 2021).

[127] Gill Hyslop, *Pizza to Ward Off Alzheimer's? Nestlé Uses DNA to Create Personalized Diets*, Bakery & Snacks (Sept. 4, 2018).

[128] John Seabrook, *Snacks for a Fat Planet*, The New Yorker, May 9, 2011.

[129] PRNE, NeuroFocus Receives Grand Ogilvy Award From the Advertising Research Foundation, GAEA TIMES (Apr. 1, 2009), https://pr.gaeatimes.com/NeuroFocus-receives-grand-ogilvy-award-from-the-advertising-research-foundation-877.

-27-

COMPLAINT

(c)    To test human response to new taste profiles, PepsiCo also uses robots fitted with human taste buds that are hardwired into a computer to simulate human neurochemical responses to product formulations.[130]

(d)    Coca-Cola employs taste biology experts and scientists who study "'taste and odor perception'" from detection by receptors in the oral and retronasal cavities, to signal transduction to the taste cortex in the brain where signals are processed . . . to ultimately contribute to the building flavor knowledge and capability for The Company."[131]

(e)    ConAgra is "using brain science . . . to grow and expand brand and portfolio offerings."[132]

(f)    General Mills maintains a large technical center with numerous sensory labs and employs sensory scientists "to guide the optimization of new products, product improvements" and product design.[133]

(g)    Kellogg's utilizes "the cognitive neuroscience approach to the multisensory design (and modification) of their food products" and maintains numerous laboratories focusing on "sensory science."[134]

(h)    Mars maintains an Advanced Research Institute focusing on the "combination of chemistry, biology and psychology . . . to understand the complex interplay between the chemical composition of food and the sensory perceptions it generates."[135]

---

[130] John Seabrook, *Snacks for a Fat Planet*, The New Yorker, May 9, 2011.

[131] Coca Cola, *Taste and Olfaction Research Senior Scientist-R&D*, (visited Apr. 2024).

[132] Jacobson/Rost, *Bringing Classic Brands into the New Economy,* https://www.jacobsonrost.com/work/conagra#:~:text=Bringing%20classic%20brands%20into%20the,expand%20br and%20and%20portfolio%20offerings (last updated 2022).

[133] Gen. Mills, *Sensory Scientist--R&D*, (visited Apr. 2024); Bill Zalud, *Managing in Tough Times*, Security Magazine, Mar. 1, 2009.

[134] Charles Spence, *Eating with Our Ears: Assessing the Importance of the Sounds of Consumption on Our Perception and Enjoyment of Multisensory Flavour Experiences*, 4 Flavour 3 (2015); Joanne O'Dea, *Kellogg's Food Science Lab Opens at Leuven Facility*, Science|Business (Sept. 13, 2013).

[135] Mars, Inc., *The Science of Deliciousness: Dr. John Didzbalis Creates Flavor for a Better Future* (May 3, 2023).

-28-

COMPLAINT

129.    In addition to Defendants' internal capacities, as demonstrated by the examples above, Defendants have engaged third party research firms to conduct brain research to guide the development of new products.

130.    For example, the Monell Chemical Senses Center, which employs chemists, biochemists, physiologists, and psychologists conducting stimuli and response research on human senses and "the essential mechanisms and functions of…taste and smell," has counted Defendants Coca-Cola, Kraft Heinz, Mars, Nestle, and PepsiCo, as corporate partners.[136]  As it turns out, this has been money well spent.  Investments in this bio research have paid dividends in tricking adults and children into eating and drinking as much UPF as they can get their hands on.

**V.    Defendants Have Created a Public Health Crisis, Especially for Children.**

131.    The public health crisis Defendants created has been particularly devastating for children.

132.    Prior to 1985, Type 2 Diabetes was a disease only found in older adults.  It was often referred to as "adult-onset diabetes" to distinguish between Type 1 Diabetes, which more traditionally presents at childhood.

133.    But, beginning in the late 1980s, doctors began seeing unusual findings in certain minority communities.  Children began presenting with all of the clinical features of Type 2 Diabetes.

134.    Rates of childhood Type 2 Diabetes continued to increase through the early 2000s—in all demographics of children but most pronounced in these minority communities.  The Centers for Disease Control noted that from 2001-2017 the rates of "Type 2 Diabetes skyrocket[ed] in Black and [Latine/x] youth."  Compared to white children, the rates of Type 2 Diabetes had grown five times as fast among Latine/x children, and nine times as fast among Black children.

135.    Type 2 Diabetes is now one of the fastest growing chronic pediatric diseases worldwide. In the U.S., the rates of childhood Type 2 Diabetes doubled between 2000 and 2017. If these trends continue, the prevalence of childhood Type 2 Diabetes is projected to increase sevenfold by 2060.

---

[136] *Corporate Partnership Program*, Monell Chem. Senses Ctr. (visited Oct. 2023).

136. The rise in incidents of pediatric Type 2 Diabetes is not solely due to the rise of incidents of pediatric obesity. Today, approximately a quarter of children with Type 2 Diabetes are not obese.

137. Like Type 2 Diabetes, fatty liver disease was formerly a disease exclusive to the elderly and alcoholics, but it now affects children in ever increasing numbers.

138. Prior to 2000, there were only a handful of documented cases of pediatric fatty liver disease in medical literature. Today millions of children are affected, with rates nearly tripling between 2017 and 2021. In some cases, children as young as toddlers are showing clinical signs of fatty liver disease.

139. Liver transplants in children (as a result of a diagnosis of fatty liver disease) have increased by 25% in the past decade.

140. As with childhood Type 2 Diabetes, a sizable fraction of pediatric fatty liver disease cases present in non-obese patients.

141. Incidents of pediatric obesity have more than tripled since the 1970s. Obesity disproportionately affects Black and Latine/x children. As alleged in greater detail below, these are the exact demographics of children the UPF industry targets with marketing.

142. Obesity existed in children before Defendants began designing, marketing, and selling UPF, but childhood Type 2 Diabetes or childhood fatty liver disease did not.

143. This is more than a mere coincidence or correlation. It is indisputable that UPF are deleterious to our health. A growing body of scientific research, as alleged above, has shown adverse health effects—including but not limited to Type 2 Diabetes, fatty liver disease, and obesity—directly tied to consuming UPF. Rates of these chronic conditions—previously unobserved in children—skyrocketed at the very same time Defendants were designing, marketing, and selling increasing quantities of UPF. There is no competing cause of the increased rates of incidence of Type 2 Diabetes and fatty liver disease. UPF are the culprit.

144. Children do not "grow out of" these chronic conditions. Rather, the ramifications of developing chronic diseases during childhood reverberate throughout the rest of that child's life. Children who develop chronic diseases such as those discussed here have diminished life

-30-

COMPLAINT

expectancy, reduced social and economic prospects, decreased happiness, and greater risks of health complications relating to their underlying condition.  Children with chronic diseases will live the rest of their lives sick and getting sicker.[137]

145.    Children and adults with Type 2 Diabetes are likely to develop diabetes-related complications, including amputation, blindness, nephropathy, and retinopathy.  Additional complications include (but are not limited to) diabetic neuropathy, coronary disease, congestive heart failure, stroke, cardiovascular mortality, nerve damage, kidney damage, hearing impairment, Alzheimer's disease, and depression.

146.    Children and adults diagnosed with fatty liver disease will develop complications as well, including (but not limited to) hepatitis, fibrosis, cirrhosis, liver failure, liver cancer, hepatocellular carcinoma, cancers outside the liver, and heart disease.

147.    The harms caused by Defendants are not, however, limited to children. Defendants' conduct is also a direct and substantial cause of increasing rates of obesity, diabetes, and other diseases in adults. The emergence of these diseases in children, and the increase of incidence of these diseases in adults, is a result of Defendants' tortious conduct.

**VI.    Defendants Have Deliberately Targeted Kids.**

148.    Defendants have spent untold millions of dollars making UPF as appealing to children as possible. They have not only added ingredients to the food to entice children to eat it; they have also invaded children's media to advertise it, integrating UPF with children's programming and creating irresistible brand partnerships.

---

[137] For instance, Canadian researchers conducted a fifteen-year follow-up of children diagnosed with Type 2 Diabetes and found an alarming number of these children suffered from blindness, amputation, kidney failure requiring dialysis, and death in young adulthood.

-31-

COMPLAINT

**A.    Defendants Use Harmful Dyes to Make UPF More Appealing to Children.**

149.    Artificial food colorings ("AFCs"), like Red 40 and Yellow 6, are petroleum byproducts found in many of Defendants' UPF.[138] Without AFCs, Defendants' UPF would be bland and colorless—unappealing to children.[139]

150.    Defendants use AFCs to entice children to eat UPF by disguising their unnatural color. In particular, AFCs are common in food that is marketed directly to small children, the subset of the population for whom AFCs carry the greatest risk.

151.    In 2008, the Center for Science in the Public Interest ("CSPI"), a non-profit consumer advocacy organization focused on food safety, filed a citizen petition with the FDA calling for the *total ban* of AFCs.[140] The petition cited over a dozen studies, as well as comprehensive meta-analysis that "strongly suggest an association between ingestion of AFCs and hyperactivity."  The petition was supported by a letter from seventeen physicians and researchers stating that AFCs "pose a health risk to many consumers, but no health benefit whatsoever to any consumers."[141]

152.    More recently, in 2021, the California Office of Environmental Health Hazard Assessment ("OEHHA") published a 288-page report, entitled "Potential Neurobehavioral Effects of Synthetic Food Dyes in Children."[142]  Looking at 27 human studies relating to the effects of AFCs, the authors concluded that the evidence "supports a relationship between food dye exposure and adverse behavioral outcomes in some children, both with and without preexisting behavioral

---

[138] Petroleum Serv. Co., *Petroleum Product of the Week: Artificial Food Dye* (Sept. 9, 2016), https://petroleumservicecompany.com/blog/artificial-food-dye-is-from-petroleum/; Ctr. for Sci. in the Pub. Interest, *Artificial Colorings* (Nov. 4, 2022), https://www.cspinet.org/article/artificial-colorings-synthetic-food-dyes.

[139] Healthline, *What You Need to Know About Yellow No. 5* (July 25, 2019), https://www.healthline.com/health/yellow-5; U.S. Food & Drug Admin., *Color Additives Questions and Answers for Consumers*, https://www.fda.gov/food/color-additives-information-consumers/color-additives-questions-and-answers-consumers#:~:text=Color%20additives%20may%20be%20used,are%20sometimes%20called%20food%20dyes.

[140] Ctr. for Sci. in the Pub. Interest, *Citizen Petition to Ban the Use of Yellow 5 and Other Food Dyes* (June 3, 2008), https://www.cspinet.org/sites/default/files/media/documents/resource/petition-food-dyes.pdf.

[141] *Id.*

[142] Cal. Off. of Envt'l Health Hazard Assessment, *Health Effects Assessment: Potential Neurobehavioral Effects of Synthetic Food Dyes in Children* (Apr. 2021), https://oehha.ca.gov/media/downloads/risk-assessment/report/healthefftsassess041621.pdf.

-32-

COMPLAINT

disorders."[143]    The OEHHA noted that the FDA's guidance on acceptable daily intake levels of APCs was based on outdated studies that were not designed to measure hyperactivity and other behavioral effects observed in children.[144]

153.    Defendants simultaneously acknowledge the dangers of including AFCs in their foods but resist their regulation.

154.    For example, in 2015, Defendant Kellogg pledged to remove AFCs from Froot Loops and other product lines by 2018—and then broke its promise.[145]

155.    Similarly, in 2016, Defendant Mars committed to remove titanium dioxide from all their candies by 2021.  Titanium dioxide, used to color foods like Skittles white, can pass through the blood-brain barrier, causing DNA damage and compromising immune response.[146] Mars missed its self-imposed deadline, telling advocates that it had changed its mind and would not remove titanium dioxide "until U.S. laws required it."[147]  Only with renewed public pressure has Mars *just this spring* "banned" titanium dioxide from its food products.[148]

156.    Defendants resist removing ingredients with such known health risks from UPF that they sell because Defendants know these ingredients entice children to consume UPF.

**B.    Defendants Have Aggressively Marketed Their UPF to Children and Successfully Changed Children's Diets.**

157.    Defendants are well aware of, and actively exploit, the power of advertising to children, which has led to disastrous health outcomes.  Nevertheless, they continue to inundate American children with unfair and deceptive marketing.

---

[143] *Id.* at 21.

[144] Univ. of Cal., Berkeley, *News Report Shows Artificial Food Coloring Causes Hyperactivity in Some Kids* (May 4, 2021), https://publichealth.berkeley.edu/news-media/research-highlights/new-report-shows-artificial-food-coloring-causes-hyperactivity-in-some-kids#:~:text=Researchers%20found%20that%20all%20of,have%20been%20observed%20in%20children.

[145] K. Miller, *Kellogg Is Under Fire for Using Artificial Food Dyes. Here's How They May Affect Your Health and Where Else to Find Them*, Fortune (Oct. 17, 2024), https://fortune.com/well/article/kellogg-froot-loops-artificial-dyes-protest/.

[146] Ctr. for Food Safety, *Mars Finally Removes Titanium Dioxide from Skittles After Decade of CFS Advocacy* (May 29, 2025).

[147] *Id.*

[148] *Id.*

-33-

158.  It is widely understood that children are unable to parse marketing material and advertisements with the critical eye of most adults.

159.  By 2006, UPF companies like Defendants were spending *over $1.6 billion per year* on advertising directed towards children.[149]  Of this, approximately $870 million was spent on marketing directed to children under 12-years-old.[150]

160.  A 2019 review by the Center for Science in the Public Interest ("CSPI") found that the number of ads marketing UPF to children were growing, and that ads targeting children increasingly failed to comply even with the UPF industry's lenient self-imposed guidelines.[151]

161.  Scientists have determined that UPF promotions "continue to present a risk to young people's heath and raise ethical concerns."[152]

162.  The CSPI found that UPF marketing "plays a key role" in poor health outcomes in children, and described the environment American children live in:

> In addition to television advertisements, children are exposed to food and beverage marketing in schools, retail stores, restaurants and movie theaters and through radio, print, websites, mobile devices, contests, events, and sponsorships.  The ubiquitous, unavoidable chorus of food messaging shapes social norms, children's food preferences, and, ultimately, their health.[153]

163.  A more recent CSPI review similarly found that "industry self-regulations contain numerous loopholes and have not demonstrably reduced most types of food marketing directed to children, nor substantially improved the nutrition of marketed products."[154]

---

[149] Sarah Botha et al., *Marketing Food to Children and Adolescents: A Review of Industry Expenditures, Activities, and Self-Regulation*, U.S. Fed. Trade Comm'n (July 2008).

[150] *Id.*

[151] Ctr. for Sci. in the Pub. Interest, Amanda Reat et al., *Changing the Channels: How Big Media Helps Big Food Target Kids (and What to Do About It)* (Nov. 2019).

[152] James W. Elsey & Jennifer L. Harris, *Trends in Food and Beverage Television Brand Appearances by Children and Adolescents from 2009 to 2014 in the USA*, 18 Pub. Health Nutr. 2015 (2015).

[153] Ctr. For Sci. in the Pub. Interest, Amanda Reat et al., *Changing the Channels: How Big Media Helps Big Food Target Kids (and What to Do about it)* (Nov. 2019).

[154] Jennifer L. Harris et al., *Hooked on Junk: Emerging Evidence on How Food Marketing Affects Adolescents' Diets and Long-Term Health*, 8 Current Addiction Reps.19 (2020).

-34-

COMPLAINT

164.   Despite repeated promises to reduce advertising targeting children, Defendants collectively target kids with billions of website advertisements every year.[155]

165.   The UPF industry continues to spend over $2 billion on advertising UPF to children each year.[156]   In addition to TV, the industry annually puts more than *3 billion ads* on popular children's websites promoting UPF.[157]   Defendants also pervasively market UPF to children[158] through social media.[159]

**C.      Big Food Targets Kids to Cultivate Lifelong UPF Customers.**

166.   Defendants target children with UPF marketing for the same reason that "Big Tobacco" targeted children with cigarette marketing: UPF companies like Defendants "view young people as potential lifelong loyal customers.  Marketing designed to hook young people on their products represents a highly profitable investment, while potential regulation of food marketing to adolescents presents a significant business risk."[160]

167.   "Big Food's" approach to UPF marketing was to maximize sales to children, who are vulnerable and not fully capable of making informed decisions.  As Philip Morris' CFO bragged in 1987, "[w]e've decided to focus our marketing on kids, where we know our strength is greatest."[161]

---

[155] A.E. Ustjanauskas et al., *Food and Beverage Advertising on Children's Web Sites*, 8 Pediatric Obesity 54 (2013).

[156] Brett Wilkins, *Sanders and Booker Take On Food and Beverage Industry with Legislation to Address Childhood Diabetes and Obesity Epidemics*, U.S. Senate Comm. on Health, Educ., Lab. & Pensions (Apr. 19, 2024); U.S. Senate Office of Richard Blumenthal, *Blumenthal, DeLauro & Booker Introduce Bicameral Bill to Curb Unhealthy Food & Beverage Marketing Targeting Kids* (Nov. 15, 2022).

[157] A.E. Ustjanauskas et al., *Food and Beverage Advertising on Children's Web Sites*, 8 Pediatric Obesity 54 (2013).

[158] Some UPF companies claim to restrict their marketing to minors and adolescents. This is slim to no comfort, as the available data demonstrates that adolescents may be even more vulnerable than younger children to UPF harmful marketing appeals, Jennifer L. Harris et al., *Hooked on Junk: Emerging Evidence on How Food Marketing Affects Adolescents' Diets and Long-Term Health*, 8 Current Addiction Reps. 19 (2020).

[159] Francis Fleming-Milici & Jennifer L. Harris, *Adolescents' Engagement with Unhealthy Food and Beverage Brands on Social Media*, 146 Appetite 104 (2020).

[160] Jennifer L. Harris et al., *Hooked on Junk: Emerging Evidence on How Food Marketing Affects Adolescents' Diets and Long-Term Health*, 8 Current Addiction Reps. 19 (2020).

[161] Hans Storr, Remarks to First Boston Beverage Tobacco Conference (April 1, 1987).

-35-

COMPLAINT

168. After acquiring General Foods and Kraft, Philip Morris slashed UPF ad spending directed to mothers and increased ad spending directed to children by many multiples.[162]

169. For example, within a few years of acquiring General Foods, Philip Morris boosted children's marketing budget for Kool Aid from $2.8 million to over $45 million, while cutting advertising directed to mothers for the same product in half.[163]

170. As yet another example, Defendant Coca-Cola specifically set out to drive individual consumption of Coca-Cola higher than individual consumption of milk and water.[164] As described by Todd Putman, Coca-Cola's former head of US Marketing, the goal was "How can we drive more ounces into more bodies more often?"[165] Kids were a major target of these efforts.[166] According to Putman, "when they would turn twelve, we'd suddenly attack them like a bunch of wolves" with marketing campaigns.[167]

171. Defendant Coca-Cola's rationale was similar to that of other Defendants—to use marketing to prey on the vulnerable. As Coca-Cola acknowledged in a 2005 internal report on targeting children, "Teens are at a crucial stage on the learning curve of 'how to be me.'"[168] In service of creating lifelong consumers of its products, teens are a critical focus of Coca-Cola's child marketing efforts.

172. And Coca-Cola would brook no dissent in its pursuit of children and teens. When Jeffrey Dunn, Coca-Cola President and COO of North and South America, suggested that Coke should stop marketing in public schools, he was called "an embarrassment to the company," and fired shortly thereafter.[169]

---

[162] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, 364 BMJ l736 (2019).

[163] *Id.*

[164] Michael Moss, *Salt Sugar Fat: How the Food Giants Hooked Us*, at 99, 108-110 (2013).

[165] *Id.* at 110.

[166] *Id.* at 110-116.

[167] *Id.* at 111.

[168] Clinkin Research, *Convenience Teens Building Loyalty with the Next Generation*, Coca Cola Leadership Council (2005).

[169] Michael Moss, *Salt Sugar Fat: How the Food Giants Hooked Us*, at 116-118 (2013).

COMPLAINT

**D.      Defendants Disproportionately Target Black and Latine/x Communities.**

173.   Defendants' UPF marketing campaigns disproportionately target Black children, who are targeted with 70% more UPF ads than their white counterparts.[170]

174.   By 1989, Kraft General Foods ("KGF"), the predecessor of Defendant Kraft Heinz, had been integrated with Phillip Morris Tobacco's advertising contracts with television, print, and other media known to reach Black and Latine/x viewers, readers, and audiences.[171]

175.   In 1990, KGF pledged $7 million to media known to reach Latine/x consumers and $2 million to media known to reach Black consumers.[172]  With the aim of marketing to Black and Latine/x children, Defendant Kraft maintained a database of millions of Black consumers and another database of predominantly Latine/x stores serving one million households.[173]

176.   Collectively, Defendants Coca-Cola and PepsiCo spent more than $1 billion annually marketing UPF to kids, and, as with other Defendants, their ads also disproportionally target Black and Latine/x children.[174]

177.   The billions of dollars the UPF industry spends targeting children disproportionately focuses on Black children, who are targeted with 70% more UPF ads than white children.[175]

178.   Obesity disproportionately affects Black and Latine/x children—the exact children the UPF industry disproportionately targets with marketing.[176]  This is a direct and intended result of Defendants' unfair and deceptive marketing practices.

[170] Daniel P. Jones, *Food Advertising Targeted to Hispanic and Black Youth: Contributing to Health Disparities*, Univ. of Conn. Rudd Ctr. for Food Policy & Obesity (2015).

[171] Kim H. Nguyen et al., *Transferring Racial/Ethnic Marketing Strategies From Tobacco to Food Corporations: Philip Morris and Kraft General Foods*, 110 Am. J. Public Health 329-336 (2020).

[172] *Id.*

[173] *Id.*

[174] Aurora Meadows et al., *Study: Big Soda's Ads Target Young People of Color, EWG* (Aug. 4, 2020),        https://www.ewg.org/news-insights/news/2020/08/study-big-sodas-ads-target-young-people-color.

[175] Daniel P. Jones, *Food Advertising Targeted to Hispanic and Black Youth: Contributing to Health Disparities*, Univ. of Conn. Rudd Ctr. for Food Policy & Obesity (2015).

[176] Div. of Population Health, Nat'l Ctr. for Chronic Disease Prevention & Health Promotion, Obesity, CDC Healthy Schools (July 9, 2024), https://www.cdc.gov/school-health-conditions/chronic/obesity.html?CDC_AAref_Val=https://www.cdc.gov/healthyschools/obesity/index.html.

-37-

COMPLAINT

**E.**    **Defendants' Marketing Techniques for Children Closely Follow the Big Tobacco Playbook.**

179.    Both R.J. Reynolds and Phillip Morris used the techniques that they developed in tobacco product development, sales, and marketing to develop and market unhealthy UPF products to children.[177]

180.    Much as they did with cigarettes, the "Big Tobacco"-turned-"Big Food" companies used cartoon mascots, child-sized packaging, and advertising messages found to appeal to children's desire for autonomy, play, and novelty to sell UPF.[178]

181.    All of the Defendants employ these same marketing tactics.

182.    "Big Food" aimed a number of its marketing campaigns at children 6 to 12 years old.[179]

183.    For instance, Defendant Kraft maintained a "Kids Task Force" that used integrated marketing campaigns, including Disney and Nickelodeon cartoons, toys, and games, to promote UPF.[180]

184.    As another example, Philip Morris collaborated with Mattel and Nintendo to issue UPF-branded toys, including Barbie and Hot Wheels.[181]   Philip Morris also collaborated with Marvel to issue UPF-branded comic book series.[182]

185.    Philip Morris also created kid-focused UPF loyalty programs, such as the Kool-Aid "Wacky Warehouse," which the director of Philip Morris' beverage division described as "our version of the Marlboro Country Store."[183]   A Philip Morris analysis called the Kool Aid Wacky Warehouse "the most effective kid's marketing vehicle known."[184]

---

[177] Tena L. Fazzino, *The Reinforcing Natures of Hyper-Palatable Foods: Behavioral Evidence for Their Reinforcing Properties and the Role of the U.S. Food Industry in Promoting Their Availability*, 9 Curr. Addict. Rep. 298 (2022).

[178] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, 364 BMJ l736 (2019).

[179] *Id.*

[180] Duncan Hood, *Kraft to Untwist Toons on ABC Disney Block*, Kidscreen, Jan. 1, 1999.

[181] Kim H. Nguyen et al., *Tobacco Industry Involvement in Children's Sugary Drinks Market*, 364 BMJ l736 (2019)

[182] *Id.*

[183] *Id.*

[184] *Id.*

-38-

186.   Philip Morris' Kraft and Burger King united in multi-million dollar integrated co-promotions on Nickelodeon in joint efforts "ratcheting up" promotion of UPF to children through TV ads, toys, and cartoons.[185]

187.   Defendant Kraft Heinz also targets children with UPF marketing, including PAW Patrol games, television ads, integrated campaigns with popular children's television and movie characters, and co-branding on children's media such as Nick Jr.[186]  In the example below, Kraft Heinz partnered with Nick Jr. to develop *Paw Patrol*-branded Kraft Macaroni & Cheese, with pasta shapes inspired by the show and packaging that depicts characters from the show.



---

[185]Philip Morris Companies, Inc., Corporate Affairs, *Today's Topics* (1998).

[186] *See*, *e.g.*, Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #1 w/ Kraft! | Nick Jr.*, (YouTube Dec. 5, 2020), https://www.youtube.com/watch?v=x8E58eLWr6Q; Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #2 w/ Kraft! | Nick Jr.*, (YouTube Dec. 12, 2020), https://www.youtube.com/watch?v=LqhFcFuUHFA; Nick Jr., *PAW Patrol: Mission Mac & Cheese Shapes #3 w/ Kraft! | Nick Jr.*, (YouTube Dec. 19, 2020), https://www.youtube.com/watch?v=FFYsf2T5e0U; Lunchables, *Lunchables TV Spot, 'Mixed Up Alert: Minions'*, (iSpot Jan. 28, 2019), https://www.ispot.tv/ad/ITcX/lunchables-mixed-up-alert-minions.

188.   Defendant Mondelez markets UPF, using Super Mario characters, television ads, interactive websites, and co-branding with children's movie characters.[187]   In the examples below, Super Mario cartoon characters have been incorporated in the packaging for Oreo cookies, and Mondelez has tied consumption of Oreos to success at the video game: "Collect cookies!  Save the kingdom!"  Mondelez also creates a sense of urgency in minor-aged consumers by marketing so-called "limited edition" decorative Oreos.  In this example, the variety of cookie is designed as a movie tie-in for children's film "If."





---

[187] *See*, *e.g.*, OREO Cookie, Super Mario x OREO Limited Edition Cookies, (YouTube Jun. 26, 2023),   https://www.youtube.com/watch?v=VJrFh8rZ9pU;   OREO   Cookie,   *Unlock   your Imagination   with   OREO   x   #ifmovie*,   YouTube   May   9,   2024), https://www.youtube.com/watch?v=n_Pdpeq5qvA.

-40-

189.    Defendant Post Holdings also airs television ads encouraging children to eat its UPF and use its UPF packaging as toys, as well as launching integrated campaigns with popular children's television and movie characters, and co-branding on children's media.[188] The below are examples of ads for Post Holdings' Fruity Pebbles Crisps and Honey Comb products—both UPF—with children as key characters in the ads.



[188]    *See*, *e.g.*, Pebbles Cereal, *Let's Do This!*, (YouTube Nov. 30, 2021), https://www.youtube.com/watch?v=5rXzi7LHYwY; Honey-Comb, *Honey-Comb TV Spot, 'Made With Nickelodeon: SpongeBob'*, (iSpot Jun. 5, 2019), https://www.ispot.tv/ad/ooOe/honey-comb-made-with-nickelodeon-spongebob; Honey-Comb, *Honey-Comb TV Spot, 'Cannonball'*, (iSpot Oct. 2, 2017), https://www.ispot.tv/ad/wKMv/honey-comb-cannonball.

190.    Defendant PepsiCo aggressively markets UPF to children using similar tactics and has increased such advertising since 2010.[189]  For example, campaigns included popular cartoon characters, contests with prizes including free trips to amusement parks, and access to brand characters.[190]

191.    PepsiCo falsely claims that it does not target marketing of UPF to children under 12.[191]  On the contrary, PepsiCo still targets children through endorsements by celebrities and

---

[189]    *Sugary    Drink    Targeted    Marketing*,    Wall    Street    Journal, https://www.wsj.com/public/resources/documents/Targeted-marketing-sheets-Children-Teens.pdf
[190] *See e.g.*, Nelson Tabolt, *When Pigs Fly - Doritos Crash the Super Bowl 2015 WINNER OFFICAL*, (YouTube Nov. 9, 2014), https://www.youtube.com/watch?v=YQo0TfuueaY; Filmpop, *The New Kid | Doritos Commercial*, (YouTube Nov. 15, 2015), https://www.youtube.com/watch?v=fvyBCesuxMM; Dans Ta Pub, Cheetos Mix Ups and Despicable Me 2, (YouTube Jul. 8, 2013), https://www.youtube.com/watch?v=AhmTMN6WaKQ; Commercials Funny, *Cheetos Commercial 2018 Beluga Whale*, (YouTube Sept. 5, 2018), https://www.youtube.com/watch?v=QwBg9mSe_IY;                        Media endohttps://www.bmsg.org/resources/publications/the-new-age-of-food-marketing-how-companies-are-targeting-and-luring-our-kids-and-what-advocates-can-do-about-it/; https://www.toyzinthebox.com/products/pre-order-jada-toys-cheetos-chester-cheetah-action-figure;                                                https://thearf-org-unified-admin.s3.amazonaws.com/ARF%20Ogilvy%20Award%20Case%20Studies/2009%20ARF%20David%20Ogilvy%20Award%20CS/Ogilvy-09-CS-Cheetos.pdf
[191] https://www.pepsico.com/docs/default-source/sustainability-and-esg-topics/pepsico-policy-on-responsible-advertising-and-marketing-to-children.pdf?sfvrsn=f7901072_3

-42-

COMPLAINT

online influencers,[192] through product placements in child-focused movies and television shows, and by advertising at youth sports and camps through sponsorships,[193] and promoting products with children's stuffed toys as mascots.[194] PepsiCo redesigned its Cheetos advertising campaign around the theme of "mischievous fun," based on consumer research with children ages 10-12.[195] In the examples below, Cheetos are directly associated with "Minions," extraordinarily popular childlike and impish characters in the "Despicable Me" children's movie franchise. As another example, depicted below, Doritos are presented to children as a "chit" to offer in exchange for friendship or popularity.

---

[192] Kathryn Montgomery, *et al.*, *Food Marketing In the Digital Age: A conceptual framework and agenda for research*, Berkeley Media Studies Group, Oct. 1, 2011, https://www.bmsg.org/resources/publications/the-new-age-of-food-marketing-how-companies-are-targeting-and-luring-our-kids-and-what-advocates-can-do-about-it/.

[193] Marx K, Greenthal E, Ribakove S, Grossman ER, Lucas S, Ruffin M, Benjamin-Neelon Se. Marketing of sugar-sweetened beverages to youth through U.S. university pouring rights contracts. Prev Med Rep. 2021 Dec 27;25:101688. doi: 10.1016/j.pmedr.2021.101688. PMID: 35127363; PMCID: PMC8800013.

[194] Toyz In The Box, *Jada Toys Cheetos Chester Cheetah Action* Figure, https://www.toyzinthebox.com/products/pre-order-jada-toys-cheetos-chester-cheetah-action-figure.

[195] https://thearf-org-unified-admin.s3.amazonaws.com/ARF%20Ogilvy%20Award%20Case%20Studies/2009%20ARF%20David%20Ogilvy%20Award%20CS/Ogilvy-09-CS-Cheetos.pdf

-43-

COMPLAINT









192.    As of 2013, despite pledges to do the opposite, PepsiCo increased its advertising to children.  Competitor Coca-Cola, meanwhile, the same year placed 38 million ads for products or promotions on children's websites.[196]

193.    Defendant Nestle markets to children using cartoon spokes-characters, marketing prominently featuring children, and integrated campaigns across multiple media platforms to target

---

[196]    *Sugary        Drink        Targeted        Marketing*,        Wall        Street        Journal, https://www.wsj.com/public/resources/documents/Targeted-marketing-sheets-Children-Teens.pdf.

-44-

COMPLAINT

children with UPF marketing.[197]  The examples included below the cartoon mascot for Nesquik chocolate milk—"Quicky"—playing with fourth graders and making bunny ears behind the teacher.




194.    Defendant ConAgra aired cartoon movies on Nickelodeon to promote children-focused product lines such as "Kid's Cuisine."[198] ConAgra's General Manager explained that "integrated promotions are critical for Kid Cuisine to drive kid requests for our meals and strengthen brand equity among children.  When Kid Cuisine partners with strong licensed properties, we've seen measurable sales increases."[199]  ConAgra also uses cartoons, super-hero spokes-characters, and ads prominently featuring young children.[200]  For example, in the images

[197] *See, e.g.*, Amazon Fresh, Nesquik Bunny Ears, YouTube (Jul. 12, 2013), https://www.youtube.com/watch?v=xmsglZvEBLY; SN ®, Hot Pockets Commercial 2022 - (USA); DeliWich | Commercial Break, YouTube (Aug. 23, 2022), https://www.youtube.com/watch?v=aNVxBTOwIXs; Sar Spary, Nestle Causes Outrage Over Ads Promoting Unhealthy Eating To Kids, Buzzfeed News (Dec. 2015), https://www.buzzfeed.com/saraspary/nestle-blasted-for-promoting-unhealthy-eating-to-children; Elizabeth S. Moore, It's Child's Play: Advergaming and the Online Marketing of Food to Children — Report, Kaiser Family Foundation 2006, Jul. 2006.

[198] Conagra News Release, *Conagra Foods' Kid Cuisine® Brand Launches Integrated Marketing Promotion with 'Planet 51(TM') Animated Movie*, Conagra Brands (Nov. 19, 2009).

[199] *Id.*

[200] *See, e.g.*, Kid Cuisine, Kid Cuisine Earth's Mightiest Popcorn Chicken TV Spot, 'Avengers Assemble', iSpot (Feb. 5, 2018), https://www.ispot.tv/ad/walC/kid-cuisine-earths-mightiest-

***Footnote continued on next page***

-45-

below, a cartoon penguin encourages children to eat Conagra UPF co-branded with Marvel Avenger super-heroes and Star Wars movie characters.





195.    Defendant General Mills's marketing featuring young children, cross promotions with popular children's movie characters, giveaways including free movie tickets to Disney cartoons, multimedia games, online quizzes, and cell phone apps to market UPF to children.[201]  For example, in the images below, a cartoon leprechaun riding a unicorn encourages children to eat

popcorn-chicken-avengers-assemble; Kid Cuisine, Kid Cuisine Galactic Chicken Breast Nuggets TV Spot, 'Junior Jedi', iSpot (Sept. 13, 2016), https://www.ispot.tv/ad/ACef/kid-cuisine-galactic-chicken-breast-nuggets-junior-jedi.

[201] Matt Richtel, *In Online Games, a Path to Young Consumers*, New York Times, Apr. 20, 2011; Anneliese Strebel, Go-Gurt Commercial 2017 Guardians of the Galaxy Vol. 2, YouTube, (Jan. 12, 2018), https://www.youtube.com/watch?v=mcyncuQfFdU; Cheerios, X, (Nov. 16, 2022), https://x.com/cheerios/status/1725222885399130220; Lucky Charms, Lucky Charms TV Spot, 'Rainbow Unicorn Marshmallows', iSpot (Jul. 29, 2019), https://www.ispot.tv/ad/oD5I/lucky-charms-rainbow-unicorn-marshmallows; Go-Gurt, GoGurt TV Spot, 'Minion Jokes', iSpot Jun. 15, 2015), https://www.ispot.tv/ad/7cQJ/gogurt-minion-jokes.

-46-

General Mills UPF, and the Minions and popular movie characters from *Guardians of the Galaxy* are used to cross-promote General Mills UPF.

 

 

196.    General Mills has also been an industry leader in online advertising that tricks children into thinking they are using an online gaming platform. This started in the late 1990s, with the General Mills "You Rule School!" platform, a gamified advertising platform for kids with embedded food ads.[202] General Mills claims that it does not market unhealthy UPF to young

---

[202] Reddit, General Mills You Rule School . . .  many childhood hours were spent spent on this website, https://www.reddit.com/r/nostalgia/comments/1g6hwm/general_mills_you_rule_school_many_childhood/.

-47-

children.[203]   However, peer-reviewed evidence shows that the company still markets unhealthy ultra-processed foods on children's television and digital media outlets.[204]

197.   Defendant Kellogg's also uses marketing featuring cartoons, spokes-characters, young children, and cross promotions with popular Disney movies to target children with UPF marketing.[205]   For example, in the images below, cartoon tigers, toucans, and elves encourage children to eat Kellogg's Frosted Flakes, Froot Loops, and Rice Krispies cereal.  Each of these products are UPF.



---

[203] General Mills, *Responsible marketing & advertising*, https://www.generalmills.com/how-we-make-it/responsible-marketing-and-advertising.

[204] Meghan L. Jensen, Frances Fleming-Milici & Jennifer L. Harris, *Are U.S. Food and Beverage Companies Now Advertising Healthy Products to Children on Television? An Evaluation of Improvements in Industry Self-Regulation, 2017–2021*, 20 Int'l J. Behav. Nutr. & Phys. Act. 118 (2023).

[205] *See, e.g.,* KelloggsUS, *Disney Frozen 2 – Kellogg's Commercial*, YouTube (Nov. 6, 2019), https://www.youtube.com/watch?v=rB4hIYwJuiY; Rice Krispies, *Rice Krispies Christmas message*, YouTube, (Mar. 11, 2013), https://www.youtube.com/watch?v=drInTjUw48w&list=PLGP6FBvf5tT6DHLv5NtvXXLTTfeY97ke2&index=145; Froot Loops, *Froot Loops® | Wild Dance*, YouTube (Dec. 5, 2022), https://www.youtube.com/watch?v=6EMTMeumq_4; Rice Krispies, *Rice Krispies Vibin' - Official Lyric Video*, YouTube (Jun. 30, 2021), https://www.youtube.com/watch?v=P-mYetXky_Y&list=PLGP6FBvf5tT6DHLv5NtvXXLTTfeY97ke2&index=162.

-48-



198.    Defendant Mars uses marketing featuring cartoons, children, popular video game characters, and Internet promotions to target children with UPF marketing.[206]  For example, in the images below, Mars uses vintage video game character Pac-Man to promote Skittles—a UPF.

---

[206] *See, e.g.*, Commercial Ads, *Skittles Commercials Compilation Taste The Rainbow Ads*, YouTube (Sept. 30, 2018), https://www.youtube.com/watch?v=GUVkO6ts2pA; Funny Commercials, *All Funniest Starburst Fruit Flavored Juicy Candy Commercials EVER!*, YouTube (Oct. 1, 2020), https://www.youtube.com/watch?v=wqeNn0sQAI4; Juicy Fruit, *Juicy Fruit Starburst TV Spot, 'Teens Use Zippers to Communicate'*, iSpot (Jan 12. 2015), https://www.ispot.tv/ad/7HjH/juicy-fruit-starburst-teens-use-zippers-to-communicate.

-49-

199.    These are only a few examples of the intensive and integrated strategies Defendants use to inundate children with UPF marketing.  Additional details will be uncovered through discovery and presented at trial.

## VII.    "Deny, Denounce, Delay:" Defendants Actively Conceal the Dangers of UPF.

200.    In December 1953, the CEOs of the major tobacco companies met secretly in New York City.  Their purpose was to counter the damage from studies linking smoking to lung cancer. What followed "were decades of deceit and actions that cost millions of lives."[207]

201.    As depicted in the Introduction to this Complaint, Big Food had its own version of that meeting in April 1999, when CEOs from Defendants met secretly in Minneapolis to discuss the "devastating public health consequences" of their actions, including 300,000 excess deaths every year and massive public health costs upwards of $100 billion each year.[208]  Executives from Defendants Kraft Heinz, Mondelez, Post Holdings, General Mills, Coca-Cola, Mars, or their predecessors, all attended this meeting.

202.    Unfortunately, just like Big Tobacco, Big Food did not change its ways, but, instead, spent the ensuing decades deceiving the public.

203.    Public health experts have found that there are "significant similarities in the action that these industries have taken in response to concern that their products cause harm…the world

---

[207] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q (2009).

[208] Michael Mudd, Remarks for ILSI CEO Dinner (Draft, April 2, 1999).

cannot afford a repeat of the tobacco history, in which industry talks about the moral high ground but does not occupy it."[209]

204.    Unfortunately, that is *exactly* what has occurred.

205.    Commenters have noted that "there are striking similarities" in the way that the Big Food and "tobacco industries have responded to public mistrust, damning scientific evidence, and calls for legal and legislative actions."[210]

206.    Like Big Tobacco, Big Food "seduces children…infiltrates schools, buys loyalty from scientists, and pressures administration officials into accepting weak and ineffective nutrition policies" or so-called self-regulation.[211]    Big Food is moreover "organized and politically powerful."[212]  It is "represented by lobbyists, lawyers and trade organizations" employed to protect it from changing its ways.[213]

207.    Big Food's strategy, like Big Tobacco's before it, is: "deny, denounce, delay."[214]

208.    Despite overwhelming evidence to the contrary, according to Big Food, all ills caused by UPF consumption is the fault of the individual consumer.  Blaming consumers for failing to take "personal responsibility" for their consumption was first deployed by Big Tobacco in 1962.[215]  Big Food's publicity machine works tirelessly to vilify its critics, to label studies highlighting the harm of their products as "junk science," and to sow doubt, in part by generating competing, biased research findings.[216]  Research publications sponsored by Big Food "showed systemic bias from

[209] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q (2009).

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] *Id.*

[214] Madeleine Speed et al., *Deny, Denounce, Delay: The Battle Over the Risk of Ultra-Processed Foods*, Fin. Times (May 22, 2024), https://www.ft.com/content/0b9ad138-1867-439f-96a5-7986d5aa66ae.

[215] Robert H. Lustig, *Ultraprocessed Food: Addictive, Toxic, and Ready for Regulation*, 12 Nutrients 3401 (2020).

[216] Kelly D. Brownell & Kenneth E. Warner, *The Perils of Ignoring History, Big Tobacco Played Dirty and Millions Died. How Similar is Big Food?*, Milbank Q (2009).

industry funding."[217] Articles sponsored exclusively by Big Food are "four times to eight times more likely to have conclusions favorable to the financial interests of the sponsoring company than those that were not sponsored" by Big Food companies.[218] Unsurprisingly, studies funded by Coca-Cola and other beverage companies were five times more likely to find no link between sugary drinks and weight gain than independent research.[219]

209.    Like Big Tobacco, Big Food takes pains to avoid even a modicum of externally imposed regulation, including taxes. In doing so, Big Food disingenuously claims that taxes on UPF "harm the poorest the most."[220] While claiming to care about harming poor communities, Big Food inundates poor communities with UPF marketing materials and UPF it knows are harmful.

210.    Yet another tactic from the Big Tobacco playbook is to pursue a protracted and sophisticated campaign to conceal the harmful nature of UPF and deceive the public. This includes exerting extreme pressure on public health infrastructure to disseminate inaccurate or misleading diet and health guidance.  Big Food's efforts in this arena have been shockingly successful.

211.    For instance, Defendant Coca-Cola paid a global network of scientists (the Global Energy Balance Network (GEBN)) $1.5 million to promote the scientifically unsupported message that physical inactivity, rather than unhealthy diet, was the cause of childhood obesity, in an effort to deflect attention from the role of sugary beverages in the obesity epidemic.[221]  After Coca-Cola's payoff, GEBN scientists claimed there was "virtually no compelling evidence" that

---

[217] *Id.*

[218] Rob Moodie et al., *Profits and Pandemics: Prevention of Harmful Effects of Tobacco, Alcohol, and UltraProcessed Food and Drink Industries*, 381 The Lancet 670 (2013).

[219] Maria Bes-Rastrollo et al., *Financial Conflicts of Interest and Reporting Bias Regarding the Association between Sugar-Sweetened Beverages and Weight Gain: A Systematic Review of Systematic Reviews*, PLoS Med (2013).

[220] WHO Regional Office for Europe, *Commercial Determinants of Noncommunicable Diseases in the WHO European Region*, SNI (2024), https://www.who.int/europe/publications/i/item/9789289061162.

[221] Anahad O'Connor, *Coca-Cola Funds Scientists Who Shift Blame for Obesity Away From Bad Diets*, The New York Times(August 9, 2015), https://archive.nytimes.com/well.blogs.nytimes.com/2015/08/09/coca-cola-funds-scientists-who-shift-blame-for-obesity-away-from-bad-diets/.

-52-

overconsumption of food and sugary drinks caused obesity, despite extensive scientific evidence to the contrary.[222]

212.    Coca-Cola also successfully leveraged its proxy organization, the International Life Sciences Institute, to derail the Chinese Centers for Disease Control's ("CCDC") efforts to address China's obesity crisis.[223]  After pressure from Coca-Cola, the CCDC's messaging scrubbed all reference to reducing consumption of UPF and focused solely on increasing physical activity to address obesity.[224]

213.    Defendants hide the truth about UPF through blatantly false and misleading marketing, not only failing to warn consumers about the health risks of UPF consumption, but also claiming, among other things, UPF products are "healthy" when they are anything but.

214.    Defendant General Mills has a history of making false marketing claims, for example, that its cereal products, including Cheerios, Trix and Lucky Charms, are "healthy," and that its Fruit Rollups have real fruit, when they don't.[225]  The Texas Attorney General has initiated legal action against the company for promoting cereals with artificial dyes as "healthy," including Red 40 and Yellow 6, which, as illustrated above, have been linked to child hyperactivity.[226]

215.    In a lawsuit settlement in California, Kellogg was forced to stop using misleading health claims on Raisin Bran, Frosted Mini-Wheats and Smart Start cereals, as well as Nutri-Grain breakfast bars that the company claimed were "healthy," "nutritious" and "wholesome," suggesting they promote health and weight loss.[227]  ConAgra markets UPF with high sugar, sodium, and processed ingredients under its "Healthy Choice" brand name.

---

[222] *Id.*

[223] Susan Greenhalgh, *Soda Science: Making the World Safe for Coca-Cola* (2024).

[224] *Id.*

[225] Truth In Advertising, *Is Cheerios Protein Misleading Consumers? New Class-Action Lawsuit Accuses General Mills of Deceptively Marketing Cheerios* (Nov. 11, 2015), https://truthinadvertising.org/articles/is-cheerios-protein-misleading-consumers/.

[226] Truman Lewis, *Texas Launches Probe of General Mills Over "Health Food" Claims*, Consumer Affairs (May 15, 2025), https://www.consumeraffairs.com/news/texas-launches-probe-of-general-mills-over-health-food-claims-051525.html.

[227] Sam Bloch, *Kellogg Agrees to Stop Marketing Sugary Cereals as "Healthy,"* The Counter (Oct. 24, 2019), https://thecounter.org/kellogg-sugary-cereal-healthy-label/.

216. Nestle is falsely marketing UPF that it claims can combat obesity, stress and menopause.[228]

217. By using these deceptive tactics to relentlessly promote UPF that Defendants knew were dangerous and addictive, while simultaneously blunting public criticism of UPF, Defendants have ensured harmful UPF are now approximately 70% of the food supply in the United States and, consequently, what consumers eat on a daily basis.[229]

218. But-for Defendants' pervasive and deceptive marketing and promotion of their UPF, consumers would not have consumed Defendants' UPF and/or would have reduced their consumption of Defendants' UPF.

**VIII.    UPF Have Contributed to a Public Health Crisis in San Francisco.**

219. Defendants' conduct has contributed to a serious health crisis in San Francisco.

220. Defendants' UPF are a substantial cause of obesity, Type 2 Diabetes, cardiovascular disease, non-alcoholic fatty liver disease,[230] and other chronic diseases, creating an environment that was and is harmful to the health of San Francisco residents—particularly those in lower-income households.

221. Public health data from 2025 shows that 9% of San Francisco residents have diabetes, and 18% of San Francisco adults are obese.[231]

222. As discussed above, Defendants intentionally engineered their UPF to be overconsumed. They disproportionately targeted children and Black and Latine/x consumers with unfair and deceptive marketing regarding their UPF.

---

[228] Mathilde de Jeu & Irene van den Berg, *Fitter, Better, Younger? Big Food's Health Supplements Mislead European Consumers,* The Investigative Desk (June 9, 2025), https://investigativedesk.com/food-manufacturers-are-massively-violating-health-claim-rules-on-their-packaging-websites-and-sales-channels/.

[229] Jessica Taylor Price, *Has your food been chemically altered? New database of 50,000 products provides answers,* Northeastern Global News (May 25, 2022), https://cos.northeastern.edu/has-your-food-been-chemically-altered-new-database-of-50000-products-provides-answers/.

[230] Cleveland Clinic, *Steatotic (Fatty) Liver Disease*, Cleveland Clinic, (Last reviewed Sept. 2023), https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease.

[231] *County Health Rankings & Roadmaps*, https://www.countyhealthrankings.org/health-data/compare-counties?compareCounties=06000%2C06075&year=2025, (Last reviewed November 2025).

223.    These tactics have predictably impacted San Francisco. In 2023, data gathered for the Youth Risk Behavior Survey (a data gathering project developed by the CDC) in San Francisco public schools showed that 16.1% of Latine/x high school students were obese, while 18.7% of Black high school students were obese. These figures are alarming on their own, but, compared to obesity rates among white and Asian students (2.5% and 4.7% respectively), these numbers show a troubling disparity.

224.    Upon information and belief, Defendants' failure to warn consumers that UPF were and are harmful and their product development and marketing targeting Latine/x and Black children are key causes of this disparity.

225.    Upon information and belief, Defendants' promotion of UPF consumption is also a key driver of the rate of diabetes in San Francisco.  As of 2024, approximately 3,578,900 adults in California, or 11.7 % of the population, had been diagnosed with diabetes.[232]  In 2017, it was estimated that the total direct medical expenses for diagnosed diabetes in California was $27 billion, the total indirect costs from lost productivity due to diabetes was $12.4 billion, and the total cost of diabetes was $39.4 billion.[233]  By 2021, the total direct medical costs associated with diabetes in California increased to approximately $40 billion.[234]

226.    In San Francisco, Type 2 Diabetes is the eighth leading cause of death. Type 2 Diabetes is also a major contributor to cardiovascular disease, which, in turn, is both the leading cause of death in the City and is the leading cause of kidney failure. [235]

227.    The harm is particularly acute for Black and Latine/x residents and for lower income residents.

228.    In San Francisco, rates of hospitalization due to diabetes are 3-6 times higher, and rates of death are 2-3 times higher, among Black residents compared to all other races/ethnicities.[236]

229.    San Francisco families of four with annual incomes of less than $64,000 are three times more likely to have Type 2 Diabetes than residents who earn more.

[235] San Francisco Health Improvement Partnership, *Diabetes*, https://sfhip.org/chna/community-health-data/diabetes/#:~:text=What%20is%20the%20status%20in,earn%20more%20(Figure%201B).
[236] *Id.*

COMPLAINT

230. The impact on San Francisco is felt most acutely in its eastern ZIP Codes (94102, 94110, 94115, and 94124), where residents are more likely to be hospitalized due to Type 2 Diabetes than those living elsewhere in San Francisco.[237] These ZIP Codes are generally areas in San Francisco with lower household median incomes.

231. Treatment for diabetes contribute to San Francisco's health care costs. In 2016 alone, hospitalization charges for cases where Type 2 Diabetes—or complications from the disease—was a primary cause of the hospitalization added up to $85 million.[238]

232. In an effort to curb the harmful impacts of this crisis, San Francisco has initiated diabetes prevention programs for its employees.[239]

233. Abating the public health crisis that Defendants caused will require, among other things, prevention programs, community health clinics, emergency medical services, public hospitals, Medicaid contributions, municipal employee health insurance and disability benefits for current and retired employees, employee wellness and disease management programs, healthcare costs in correctional facilities, public health research, social safety net programs (*e.g.*, food assistance programs and housing/homelessness support), and other City-subsidized programs.

**FIRST CAUSE OF ACTION**
**Violations of the Unfair Competition Law ("UCL")**
**(On Behalf of the People of the State of California)**
**(Bus. & Prof. Code §17200, *et seq.*)**

234. Plaintiff incorporates herein by reference Paragraphs 1-233 of this Complaint.

235. The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

---

[237] *Id.*

[238] *Id.*

[239] The prevalence of Type 2 diabetes apparently prompted San Francisco to initiate a Diabetes Prevention Program ("DPP") for its employees to try to address the crisis, which was the subject of a study published by the Center for Disease Control in 2020. Assiamira Ferrara et al., *Comparative Effectiveness of 2 Diabetes Prevention Lifestyle Programs in the Workplace: The City and County of San Francisco Diabetes Prevention Trial*, CDC (May 28, 2020), https://www.cdc.gov/pcd/issues/2020/19_0396.htm#:~:text=In%20this%20trial%2C%20158%20City,to%20offer%20Diabetes%20Prevention%20Programs.

San Francisco City Attorney David Chiu is authorized to prosecute this claim on a statewide basis on behalf of the People of the State of California under Business and Professions Code Section 17204.

236.   Defendants' conduct has and continues to be unlawful, fraudulent, and/or unfair. This conduct includes, but is not limited to, the following:

(a)   concealing the risks and harms associated with UPF;

(b)   affirmatively misrepresenting that UPF have characteristics, ingredients, uses, or benefits they do not have;

(c)   advertising UPF as healthy and not harmful when they intended to and did in fact sell unhealthy and harmful UPF;

(d)   failing to disclose to consumers that UPF were unhealthy and harmful when they intended to and did in fact sell unhealth and harmful UPF;

(e)   representing that UPF met standards and quality of healthy foods when they were unhealthy and harmful to health;

(f)   disparaging healthier whole foods in favor of its UPF;

(g)   falsely and deceptively promoting UPF for consumption by at risk populations, including children, and in particular Black and Latine/x children, which Defendants knew or should have known would experience adverse health effects;

(h)   mispresenting the safety and benefits of UPF;

(i)   misrepresenting the existence of and findings of scientific data, studies, reports, and clinical trials concerning the safety of UPF;

(j)   concealing negative findings concerning the safety of UPF;

(k)   publishing articles, studies, and reports misrepresenting the scientific credibility of data and touting the safety of UPF, and then disseminating copies of such studies;

(l)   Defendants' conduct creates a public nuisance; and

(m)   misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of articles and publications used to sell UPF.

237.   These unlawful, fraudulent, and/or unfair acts occurred throughout California.

238. Each of the above practices provides individual and independent basis for injunctive and civil penalties and together create a false net impression regarding the safety and health risks of UPF.

239. Defendants' conduct is also unlawful under the Consumer Legal Remedies Act (CLRA), Civil Code Section 1770, subsections (a)(5) (misrepresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not; (a)(7) (misrepresenting that goods or services are of a particular standard, quality, or grade); (a)(8) (disparaging the goods, services, or business of another by false or misleading representation of fact); and (a)(9) (advertising goods or services with intent not to sell them as advertised).

240. Defendants' conduct, both individually and collectively, were and continue to be likely to deceive the public regarding the risk of addiction and serious health risks associated with UPF. Defendants repeatedly and continuously violated and continue to violate the UCL by engaging in the unlawful, fraudulent, and unfair practices described herein.

241. Defendants have special, if not exclusive, knowledge concerning the dangers and health risks of UPF, and repeatedly concealed and distorted material facts from the public. Defendants have known that their UPF pose serious health risks to consumers.

242. Defendants' conduct—which has caused a public health crisis and will lead to life-long and life-threatening diseases—is immoral, unethical, oppressive, and substantially injurious to consumers. There are no countervailing benefits to Defendants' conduct. Because of Defendants' deceptive acts, including deceptively and purposefully addicting consumers to unhealthy and harmful UPF, the harms alleged herein could not have been avoided by consumers.

243. Disclosure is required to correct the misleading representations and impressions from Defendants that their UPF are safe and do not pose any health risks to consumers.

244. The untrue and misleading statements and advertisements in connection with the sale and promotion of UPF were made through communication channels including, but not limited to, television, radio, websites, blogs and internet, social media, newspapers, magazines and other publications.

-58-

COMPLAINT

245. The untrue and misleading statements and advertisements in connection with the sale and promotion of UPF were likely to deceive members of the public, including, but not limited to, the children to whom they primarily directed their advertising and other messaging.

246. Based upon the alleged conduct herein, each Defendant committed a separate and independent willful violation of the UCL through each and every unlawful, unfair, fraudulent, deceptive, false, or misleading advertisement or representation, or omission of material information, to the public.

247. The City Attorney, acting on behalf of the People of the State of California, seeks statewide injunctive relief, and civil penalties as permitted by law for Defendants' UCL violations.

**SECOND CAUSE OF ACTION**
**Public Nuisance (on Behalf the People of the State of California)**
**Violations of Civil Code §§ 3479-3480**

248. Plaintiff incorporates herein by reference Paragraphs 1-247 of this Complaint.

249. Defendants: (1) intentionally engineered UPF to deceive the body to crave and consume what it otherwise would not; (2) failed to include any warnings regarding the health consequences of UPF in connection with their sale, despite being fully aware of these adverse health consequences, (3) made fraudulent statements by advertising these UPF as natural or healthy, and (4) targeted these harmful products to children.

250. Defendants' actions and omissions—individually and collectively—were substantial factors in creating conditions that were—and are—harmful to health, including but not limited to markedly increased incidents of chronic diseases like Type 2 Diabetes and fatty liver disease.

251. Defendants have unreasonably interfered with the People's right to be free from a substantial injury to the health, safety, peace, comfort, and convenience of the general community. Defendants' actions have created conditions that are harmful to health in various ways, including but not limited to a distortion of consumer habits resulting in pervasive overconsumption of harmful UPF and increased rates of chronic disease and death.

252. Defendants' conduct affected a substantial number of people at the same time, as evidenced by the public health crisis described herein.

253. Defendants' interference is the kind by which an ordinary person would be reasonably annoyed or disturbed.

-59-

COMPLAINT

254. The seriousness of the harm Defendants' conduct has caused vastly outweighs any social utility of Defendants' conduct.

255. Defendants' conduct is a substantial factor in causing this harm to the People.

256. The People seek abatement of the public nuisance plaguing the City and County of San Francisc, including costs associated with future efforts to abate the public nuisance caused by Defendants, as well as injunctive relief to lessen or prevent the threat of future harm from Defendants' actions. Abatement of the public nuisance in the City and County of San Francisco may include, but is not limited to, consumer education on the health risks of ultra-processed foods, honest marketing of the risks of ultra-processed food consumption, more robust healthcare and associated costs, subsidies for distribution of real food where Defendants' actions have wrongfully limited such access and limiting advertising and marketing of UPF to children and vulnerable adults.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court render judgment in Plaintiff's favor against Defendants, jointly and severally, and grant Plaintiff the following relief:

1. A statewide order enjoining Defendants from further deceptive marketing and requiring them to take affirmative action to ameliorate the effects of their prior false marketing as set forth above;

2. An order enjoining Defendants from maintaining the public nuisance in San Francisco that Defendants created or assisted in creating;

3. Costs to abate the public nuisance Defendants created or assisted in creating in San Francisco;

4. An award of statewide civil penalties to the People of the State of California under Bus. & Prof. Code Sections 17204 for all UCL violations occurring within the State of California;

5. Plaintiff's costs and reasonable attorneys' fees;

6. Any and all further relief available under the applicable laws; and

7. Any and all further relief that this Court deems appropriate.

**Dated**: December 2, 2025                    Respectfully submitted,

-60-

COMPLAINT

/s/ David Chiu
DAVID CHIU (189542)
City Attorney
YVONNE R. MERE (173594)
Chief Deputy City Attorney
SARA J. EISENBERG (269303)
Chief of Complex & Affirmative Litigation
RONALD LEE (SBN 238720)
Asst. Chief of Complex & Affirmative Litigation
JESSE E. LANIER (SBN 303395)
Deputy City Attorney
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California  94102
Tel.:  415-554-3944
cityattorney@sfcityatty.com

Jennie Lee Anderson (SBN 203586)
**ANDRUS ANDERSON LLP**
1970 Broadway, Suite 1070
Oakland, California  94612
Tel.: 415-986-1400
jennie@andrusanderson.com

Diandra S. Debrosse*
**DiCELLO LEVITT LLP**
505 20th Street North, Suite 1500
Birmingham, Alabama 35203
Tel.:  205-453-6415
fu@dicellolevitt.com

Adam J. Levitt*
Daniel R. Ferri*
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: 312-214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com

Rene F. Rocha*
**MORGAN & MORGAN, P.A.**
1100 Poydras Street, Suite 2900
New Orleans, Louisiana  70163
Tel.:  504-636-6310
rrocha@forthepeople.com

Frank M. Petosa*
**MORGAN & MORGAN, P.A.**
8151 Peters Road, Suite 4000
Plantation, Florida  33324

-61-

COMPLAINT

Tel.:  954-318-0268
fpetosa@forthepeople.com

***Attorneys for Plaintiff The People of the State of California, acting by and through San Francisco City Attorney David Chiu***

**\****pro hac vice pending*

-62-